# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

--------------
## NO. 03-01-00037-CV
--------------


**W. W. Laubach Trust/The Georgetown Corporation, Appellants**

**v.**

**The Georgetown Corporation/W. W. Laubach Trust, Appellees**


-----------------------------------------------------------------

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 90-407-C368, HONORABLE BURT CARNES, JUDGE PRESIDING**
-----------------------------------------------------------------


Appellant W. W. Laubach Trust (Athe Trust@) appeals the district court=s judgment awarding damages and attorney=s fees against the Georgetown Corporation (ATGC@) for breach of contract and trespass. In four issues, the Trust contends that the district court erred by: (1) granting TGC=s motion for partial summary judgment; (2) granting declaratory judgment on the construction of a lease provision; (3) denying the Trust=s request for termination of the lease; and (4) awarding a clearly erroneous amount of damages for its breach of contract and trespass claims. In two issues, cross appellant TGC contends that the court erred by failing to find that the Trust=s trespass and breach of contract claims were barred by limitations. We will affirm in part and reverse and remand in part the judgment of the district court.

## BACKGROUND

In 1965, W. W. Laubach leased property in Williamson County to TGC for the purpose of operating the Inner Space Caverns. Section 301(A) of the ninety-nine-year lease provides for rents in the form of a percentage of three categories of revenue:

> Lessee shall pay to the lessor as rent during the term of this lease an annual amount equal to the sum of (1), (2), and (3), viz:
>
> (1) Ten per cent (10%) of the gross amount received by Lessee during such Lease Year from *the sale of admissions* to the cavern upon the leased premises and from *the operation of any concession* in connection with such cavern involving the furnishing of services (e.g., pony ride and merry-go-round), computed after deducting from such gross receipts all taxes (exclusive of Lessee=s income taxes) paid on account of such receipts; plus
>
> (2) Five per cent (5%) of the gross amount received by Lessee during such Lease Year from *the sale of items of food, drink, and merchandise* in connection with operation of the cavern, computed after deducting from such gross receipts all taxes (exclusive of Lessee=s income taxes) paid on account of such receipts; plus
>
> (3) Fifty per cent (50%) of the net income of Lessee in such Lease Year from *any use of the leased premises other than those uses specified in (1) and (2) above*, computed in accordance with standard accounting principles and without deduction on account of any income taxes of Lessee or real estate taxes payable by Lessee. *In determining such net income, deduction for Lessee=s general and administrative expenses shall be an amount equal to ten per cent (10%) of Lessee=s gross receipts.*

(Emphasis added.) The parties dispute the construction of section 301(A)(3) and therefore disagree over the manner of calculating the rental due for this third category of revenue. Article 8 of the lease agreement grants TGC the option to lease additional parcels of land located across Interstate 35 from the leased property. In 1967, Laubach, as settlor, transferred all the leased and optioned property to the Trust.

In May 1986, one of the Trust=s trustees learned of two unauthorized billboards on the property, one on a leased parcel, and one on an option parcel that TGC had not leased from the Trust. TGC had leased both parcels to Pearce Outdoor Display, Inc. (APearce@) for the purpose of erecting advertising billboards. Four years later in a letter dated June 6, 1990, the Trust notified TGC that it considered the lease to be in default. The Trust itemized four areas of default, two of which are relevant to the present case: (1) failure to pay the proper amount of rent, and (2) failure to provide a true and accurate accounting of revenues and rent. Pursuant to section 701 of the lease, the Trust gave TGC thirty days to correct these deficiencies.

On July 5, 1990, TGC responded to the Trust=s notification by requesting clarification and attempting to cure the alleged defaults. TGC tendered accountings and two checks, one in the amount of $1,416.81 for outstanding taxes, and one in the amount of $10,500 for rental revenues it had received on the billboard located on the unleased option parcel. TGC contended that pursuant to section 301(A)(3) of the lease agreement, it owed no rent for the billboard located on the leased property because A10% of [TGC]=s gross receipts exceeded any rental income from the sign.@

On October 10, 1990, the Trust filed its original petition seeking declaratory judgment on the parties= disputed construction of section 301(A)(3) of the lease and for conversion. Although both parties claimed that section 301(A)(3) was unambiguous, they asserted conflicting interpretations. On May 14, 1991, TGC filed a motion for partial summary judgment requesting a declaration that in calculating its rental obligation, section 301(A)(3) entitled TGC to deduct from its third category revenue ten percent of its gross receipts from all three revenue sources. On May 31, the Trust filed a motion for partial summary

**3**

judgment requesting a declaration that section 301(A)(3) only entitled TGC to deduct from its third category revenue ten percent of its gross receipts from those other revenue sources not covered by sections 301(A)(1) and 301(A)(2). On August 26, the trial court rendered an order granting TGC=s motion and denying the Trust=s motion.

On April 6, 1992, six years after the trustee first discovered the presence of the billboards, the Trust filed its second amended petition. Despite the trial court=s order granting TGC=s motion for partial summary judgment as to the construction of section 301(A)(3), the Trust sought a declaratory judgment specifically on the meaning of Agross receipts@ as found in that provision. In addition, the Trust=s second amended petition sought (1) declaratory judgment on past rentals received by TGC and owed to the Trust; (2) rescission of a portion of the lease; (3) actual and punitive damages for conversion of the billboard rentals, (4) damages for trespass[1] resulting from the construction of the billboard on lease-option property or, alternatively, an injunction ordering TGC to remove it; (5) damages for breach of contract; (6) termination of the lease; (7) damages for quantum meruit; and (8) attorney=s fees. After a bench trial, the trial court denied the Trust=s claims for declaratory judgment, rescission, conversion, termination of the lease, and quantum meruit. The court found that the Trust was entitled to recover damages on its trespass and breach of contract claims and awarded the Trust $7,795.35 in actual damages, $31,000 in attorneys fees, and $100,000 in punitive damages. The court also awarded TGC $7,425.[2]

---

[1] The Trust originally brought a trespass suit against Pearce Outdoor Display, Inc. (APearce@), the sublessee responsible for constructing the billboards. However, the parties settled the claim for $71,049.70.

[2] Although the trial court ultimately determined the Trust was not entitled to rents from

the billboard located on the leased property, TGC had tendered such payments to preserve the lease pending the outcome of litigation. TGC filed a counterclaim to recoup those payments and was awarded $7,425. The Trust does not challenge this refund on appeal.

## DISCUSSION

### *Summary Judgment*

In its first issue, the Trust contends that the district court erred by granting TGC=s motion for summary judgment. Because the propriety of a summary judgment is a question of law, we review the trial court=s decision *de novo. Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *Texas Dep=t of Ins. v. American Home Assurance Co.*, 998 S.W.2d 344, 347 (Tex. App.CAustin 1999, no pet.). The standards for reviewing a traditional motion for summary judgment are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). The summary judgment is affirmable on appeal if any ground asserted in the motion for summary judgment is a valid ground for rendering summary judgment. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996).

TGC filed its motion for partial summary judgment seeking construction of section 301(A)(3) of the lease agreement. In its motion for summary judgment, TGC requested that

> the Court declare that Section 301(A)(3) of the Lease Agreement be construed so that the deduction for general and administrative expenses under such section will be 10% of the gross receipts of the Lessee (as defined in the Lease Agreement) and not limited to gross receipts from activities subject to Section 301(A)(3).

The Trust filed its motion for partial summary judgment requesting that the Court declare that Section 301(A)(3) of the Agreement of lease be construed so that Defendant lessee may deduct ten percent of the gross receipts from activities subject to Section 301(A)(3) before sharing income from such activities equally with Plaintiff lessor; that the Court grant partial summary judgment that all income that has been derived from [the billboard on the property not leased from the Trust] belongs to Plaintiff; [and] that the Court grant partial summary judgment that all income that has been derived from [the billboard on the leased property] shall be allocated to the parties in accordance with Section 301(A)(3).

It contended that the lease was unambiguous, but that if it were ambiguous, the summary judgment proof reflected the parties= intent that this was their agreed construction.

On August 26, the district court granted TGC=s motion and denied the Trust=s motion. In the order, the district court declared

that Section 301(A)(3) of the Lease dated August 27, 1965, between W. W. Laubach and Elsie Laubach, as lessors, and Georgetown Corporation, as Lessee, is unambiguous; and that Section 301(A)(3) of the Lease shall be construed so that the deduction for general and administrative expenses of Georgetown Corporation provided for by that Section shall be an amount equal to ten percent (10%) of the gross receipts of Lessee, and that such gross receipts shall not be limited to gross receipts from uses of the leased premises subject to Section 301(A)(3) of the Lease.

On appeal, the Trust contends that the district court erred by granting summary judgment in TGC=s favor because section 301(A)(3) is ambiguous. We agree.

Ordinarily, when two opposing parties each file a motion for summary judgment and an appeal results, the appellate court can Adetermine all questions presented, and may reverse the trial court judgment and render such judgment as the trial court should have rendered, including rendering judgment for the other movant.@ *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988). However, we may also reverse

**7**

the judgment and remand the cause when we find that course proper. *See Coker v. Coker*, 650 S.W.2d 391, 392 (Tex. 1983).

Whether a contract is ambiguous is a question of law for the court to decide. *Landry=s Seafood Rests., Inc. v. Waterfront Café, Inc.*, 49 S.W.3d 544, 549 (Tex. App.CAustin 2001, pet. dism=d) (citing *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996)). A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Id.* (citing *Coker*, 650 S.W.2d at 394). AIf a contract is worded in such a manner that it can be given a definite or certain legal meaning, then it is not ambiguous.@ *Id.*

In determining whether an agreement is ambiguous, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *K3 Enters. v. McDaniel*, 8 S.W.3d 455, 458 (Tex. App.CWaco 2000, pet. denied) (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951)). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* (citing *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962)). A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993). However, an ambiguity does not arise merely because the parties advance conflicting interpretations. *K3 Enters.*, 8 S.W.3d at 458. When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue. *Id.* (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979)).

**8**

TGC contends that Agross receipts@ in section 301(A)(3) refers to all income from all sources regardless of whether the revenue flows from categories covered by sections 301(A)(1), 301(A)(2), or 301(A)(3). If this interpretation is correct, TGC is entitled to deduct from its 301(A)(3) revenue a general administrative deduction of ten percent of its revenues from all sources, thereby substantially decreasing the overall amount from which rents to the Trust are calculated, and consequently reducing the total rental payments. The Trust, on the other hand, contends that Agross receipts@ refers only to those revenues covered by section 301(A)(3). The Trust=s interpretation would limit TGC=s ten percent administrative deduction to those revenues covered by section 301(A)(3). Therefore, rentals from revenue from other uses described in the third category would be calculated without a ten percent administrative deduction from cavern related services and refreshment and merchandise sales, increasing TGC=s rental payments accordingly.

Examining the lease agreement in its entirety in light of the standards set out above, we conclude that the provision ALessee=s gross receipts@ cannot be given a certain or definite legal meaning or interpretation. On the one hand, the term may be read to refer to all of the lessee=s revenues from all sources. On the other, the ten percent administrative deduction appears only in section 301(A)(3) with respect to calculating Anet income . . . from any use of the leased premises other than those uses specified in [301(A)](1) and (2). . . .@ Although the trial court=s construction is a reasonable one, we hold that the contrary reading is an equally reasonable construction. We therefore hold that the use of Agross receipts@ in section 301(A)(3) creates an uncertainty as to whether the ten percent administrative deduction applies to all income from all sources and is, therefore, ambiguous. Because we hold that the provision is ambiguous,

9

we sustain the Trust=s first issue.  Accordingly, we do not reach the Trust=s second issue.  *See* Tex. R. App.

P. 47.1.  In any event, the intent of the parties is a question of fact.

*Termination of the Lease Agreement*

In its third issue, the Trust contends that the trial court erred as a matter of law by refusing

to grant its request for termination of the lease because the evidence is undisputed that TGC defaulted under

the terms of the lease.  Section 701 of the lease gives the Trust the right to terminate the lease

[i]n the event that during the term of this lease . . .

(a)  Lessee shall default in the payment of any installment of rent or other sum herein specified to be paid by Lessee, and such default shall continue for 30 days after written notice thereof from Lessor to Lessee; or

(b)  Lessee shall default in the observance or performance of any of Lessee=s covenants, agreements or obligations hereunder, and such default shall not be cured within 30 days after Lessor shall have given to Lessee written notice specifying such default or defaults . . . .

The Trust claims it proved its right to terminate the lease because TGC defaulted by failing

to pay correct rents and provide accountings as required by sections 301(A) and 301(C)[3] of the lease.  The

---

[3]     Section 301(C) of the lease provides in part:

With each rental payment Lessee shall furnish Lessor with a written statement, certified by Lessee, setting forth in reasonable detail the basis of computation of the rental payment.  Within 90 days after the end of each lease year, Lessee shall furnish Lessor with an audited statement of rental due for such Lease Year prepared by a Certified Public Accountant reasonably acceptable to Lessor. . . .

The record reflects that TGC provided the Trust with annual accountings along with is rental payments.

**10**

Trust did not request and the district court did not file findings of fact or conclusions of law.  In their absence, an appellate court should presume the trial court made all necessary findings to support its judgment. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989).  In an appellate court=s review of a trial court finding, all of the evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered.  *Formosa Plastic Corp. USA v. Presidio Eng=rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  *Id.*

---

After the Trust=s June 1990 letter, TGC provided the Trust with the amount of rent collected for the billboard located on the option property and an accounting for the billboard located on the leased property.  On appeal, the Trust contends that TGC Afailed to provide a CPA=s accounting of rental income.@

Generally, courts do not favor termination and "in the absence of willful and culpable neglect on the part of the lessee a forfeiture will not be decreed for failure to comply with the covenants of the lease, especially where adequate compensation can be made for the breach." *Caranas v. Jones*, 437 S.W.2d 905, 912 (Tex. Civ. App.—Dallas 1969, writ ref=d n.r.e.). TGC admitted it never properly exercised the option to lease the property upon which one of the billboards was constructed, but it acted to cure any default by tendering rental payments for that billboard immediately upon the Trust=s demand. As for the billboard on the leased parcel, section 601 of the lease clearly allows TGC to "sublease any part of the leased premises, at any time, without the consent of Lessor." Whether TGC has paid the *correct* amount of rent for that property may be determined on remand to the district court in light of our disposition of the Trust=s first issue, but the record does not reflect that TGC exercised the "willful and culpable neglect" necessary to entitle the Trust to termination of the lease. As one court of appeals has noted, "[a]lthough parties may contract to provide for forfeiture upon default, where equities are shown which justify a continuation of the contract rather than forfeiture of it, the forfeiture will be prevented." *T-Anchor Corp. v. Travarillo Assoc.*, 592 S.W.2d 622, 627 (Tex. Civ. App.—Amarillo 1975, no writ).

The Trust cites only one case in support of its contention that because section 701 provides for termination in clear and unambiguous terms, this Court must set aside the trial court=s refusal to terminate the lease with TGC. That case, *Home Reader Service, Inc. v. Grappi*, 446 S.W.2d 95 (Tex. Civ. App.—1969, writ ref=d n.r.e.), is clearly distinguishable from the present case. *Grappi* involved an employment contract providing for termination of the employee "should [he] . . . fail to keep or fully perform any of the terms of this agreement on his part to be kept." *Id.* at 98. The employee in *Grappi* repeatedly

**12**

failed to comply with the contract and ignored his employer=s numerous demands to do so. *Id*. at 97. Only after the employer=s repeated requests for compliance did the court order termination of the contract. *Id.* at 99. The court reached this conclusion on the ground that A[a] contract provision for termination by either party >when fairly entered into, will be enforced if not contrary to equity and good conscience.=@ *Id*.

Here, the record reflects that TGC responded to the Trust=s default claims within thirty daysCthe time prescribed by section 701 of the leaseCwith a check for $10,500, accountings, and requests for further explanation as to the other alleged defaults. Proof of TGC=s timely response constitutes more than a scintilla of evidence to support the district court=s denial of the Trust=s request to terminate the lease. Further, we conclude that terminating this lease because of TGC=s failure to pay a relatively small percentage of the rent owed to the Trust would beAcontrary to equity and good conscience.@ *See Grappi*, 446 S.W.2d at 99. Accordingly, we overrule the Trust=s third issue.

### *Damages*

In its fourth issue, the Trust contends that the district court=s damage award of $7,779.35 is clearly erroneous in light of the evidence that the Trust incurred expenses of $27,454.48 as a result of TGC=s breach of contract and trespass. Because the Trust did not request findings of fact or conclusions of law, we presume that the district court made all necessary findings from the evidence to support its judgment. *Roberson*, 768 S.W.2d at 281. We review the district court=s implied findings by considering all of the evidence in a light most favorable to the verdict. *Formosa Plastic Corp. USA*, 960 S.W.2d at 48. Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.*

**13**

During the construction of the billboards, a fence on the Trust=s property was destroyed, releasing the Trust=s livestock and ultimately resulting in the loss of its agricultural use exemption. The Trust claimed that it incurred $27,454.48 in expenses in its efforts to maintain the exemption on the property. Wilburn Laubach testified that the total $27,454.48 included $3,500 for a land planning study, $1,000 for lease agreement negotiation and research, $1,207 in attorney=s fees incurred by his brother, and $278 for property insurance renewal. Laubach=s testimony provides more than a scintilla of support for the district court=s decision to reduce the amount of actual costs associated with the loss of the agricultural use exemption to $21,790.91. Further, the record reflects that the Trust requested that TGC compensate it Aby the ratio of leased land to the total acreage (50/140 or 35.7% or $9801.24).@ In light of the district court=s reduction of actual costs associated with the maintenance of the agricultural use exemption to $21,790.91, accompanied by the fact that 35.7% of $21,790.91 is $7,779.37, we hold that the evidence supports the damage award of $7,779.35. We overrule the Trust=s fourth issue accordingly.

*Statutes of Limitation*

In its two issues as cross appellant, TGC contends that the district court erred by failing to find the Trust=s trespass and breach of contract claims were barred by limitations. The record reflects that these defenses were pleaded and argued to the court at the conclusion of the bench trial. Because TGC is attacking adverse findings on issues upon which it had the burden of proof, we treat its issues as asserting that it established its limitations defense as a matter of law. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles: (1) the record must be examined for evidence that supports the finding, while ignoring

**14**

all evidence to the contrary; and (2) if there is no evidence to support the fact finder=s answer, the entire record must be examined to see if the contrary position is established as a matter of law.[4]  *See id.*; *see also Upjohn Co. v. Freeman*, 885 S.W.2d 538, 541-42 (Tex. App.CDallas 1994, writ denied).

In its first issue, TGC contends that the Trust=s trespass claim was barred by limitations. The statute of limitations for trespass to real property is two years.  *See* Tex. Civ. Prac. & Rem. Code Ann. ' 16.003(a) (West 1986); *see also First Gen. Realty Corp. v. Maryland Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.CAustin 1998, pet. denied).  The trustee learned of the presence of the billboards in May 1986, but the Trust failed to file any action until October 10, 1990.  Further, the Trust did not amend its pleading to assert a cause of action for trespass until April 6, 1992, almost six years after the billboards were discovered.

Generally, the limitations period for trespass begins to run when the claim accrues or when damages are sustained.  *F.D. Stella Prods. Co. v. Scott,* 875 S.W.2d 462, 464 (Tex. App.CAustin 1994, no writ).  In order to establish its statute of limitations defense, TGC must establish the date on which the cause of action accrued.  *Damron v. Ornish*, 862 S.W.2d 683, 685 (Tex. App.CDallas 1993, writ denied).  Texas courts generally apply the discovery rule to causes of action for damage to property.  *See, e.g.*, *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 443 (Tex. App.CFort Worth 1997, pet.

---

[4]  We note that TGC did not move for summary judgment on its limitations defenses.  *See* Tex. R. Civ. P. 166a(c) (summary judgment Ashall be rendered forthwith if . . . the moving party is entitled to judgment as a matter of law.@).

denied); *Heron Fin. Corp. v. United States Testing Co.*, 926 S.W.2d 329, 331 (Tex. App.CAustin 1996, writ denied). Therefore, in accordance with the discovery rule, TGC argues the limitations period began to run when the Trust discovered the billboards in 1986, and that the Trust=s trespass claim is therefore barred.

The Trust, however, urges the application of the continuing tort doctrine, an exception to the discovery rule. *First Gen. Realty*, 981 S.W.2d at 495. The continuing tort doctrine applies to tortious acts that are inflicted over a period of time and repeated until desisted. *Dickson Constr., Inc.*, 960 S.W.2d at 851. Continuing torts create a separate cause of action each day they exist. *Id.* The doctrine provides that a cause of action for a continuing tort does not accrue until that tortious act ceases. *Id.* While the continuing tort doctrine does not apply to claims arising from permanent injury to land, *Barlett*, 958 S.W.2d at 443, we cannot say that TGC has established the permanent nature of the billboard as a matter of law. *See Marathon Oil Co.*, 767 S.W.2d at 690.

In support of its contention that the continuing tort doctrine does not apply to the Trust=s trespass claim, TGC argues on appeal that the billboard constitutes a permanent injury because A[t]here has been nothing sporadic about the presence of Sign X and it is not contingent upon any irregular force such as the weather.@ Texas cases recognizing the presence of a continuing tort generally involve repeated wrongful conduct and not the continuous presence of a fixed structure. *See, e.g.*, *Upjohn Co.*, 885 S.W.2d at 542 (holding continued use of injury-producing medication could be continuing tort); *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex. App.CAustin 1990), *rev=d on other grounds*, 855 S.W.2d 619 (Tex. 1993) (holding negligent infliction of emotional distress is continuing tort)*; Adler v. Beverly Hills Hosp.*, 594

S.W.2d 153, 155 (Tex. Civ. App.C Dallas 1980, no writ) (concluding false imprisonment is continuing tort for purposes of tolling statute of limitations).  Neither party provides, nor are we aware of, authority addressing the issue of whether a fixed structure can constitute a continuing tort.  *See, e.g.*, *Newton v. Newton*, 895 S.W.2d 503, 506 (Tex. App.C Fort Worth 1995, no writ) (involving claim for intentional infliction of emotional distress based on pattern of abusive behavior); *McClellan v. Krebs*, 183 S.W.2d 758, 761-63 (Tex. Civ. App.C Fort Worth 1944, writ ref=d w.o.m.) (holding that plaintiffs were barred by limitations from recovering damages arising from construction of terraces).  However, Texas courts have recognized the permanent nature of billboards by categorizing them as Astructures@ and Afixtures.@ *See, e.g.*, *Aldo Adver., Inc. v. Industrial Prop. Corp.*, 722 S.W.2d 524, 527 (Tex. App.C Dallas 1986, writ ref=d n.r.e.); *Stevenson v. Clausel*, 437 S.W.2d 404, 407 (Tex. Civ. App.C Houston [14th Dist.] 1969, no writ) (holding that main characteristic of fixture is intention to make it Aa permanent accession to the freehold@).

While the billboard may constitute a permanent injury in light of the above authorities, we cannot say that TGC established its permanent nature as a matter of law.  *See Upjohn Co.*, 885 S.W.2d at 544.  The only evidence TGC offers in support of its contention is that the Trust filed the action more than two years after the billboard was discovered; it further argues on appeal that the billboard=s presence on the property has been constant and continuous, a fact which might be inferred from the evidence.  The continuous nature of a trespass is generally indicative of a permanent injury; however, the continuing tort doctrine also applies in cases in which the tortious conduct can be enjoined by a court or otherwise terminated.  *Bartlett*, 958 S.W.2d at 443 n.8.  Because the district court could have ordered the billboard

removed as the Trust requested, and because TGC=s only evidence of the permanent nature of the billboard is its apparent continuous presence on the property, we hold that TGC has not demonstrated that the record conclusively proves, as a matter of law, that the Trust=s cause of action accrued, and the limitations period commenced, more than two years before the Trust brought suit. *See Upjohn Co.*, 885 S.W.2d at 544 (upholding denial of directed verdict in light of movant=s failure to prove, as matter of law, that cause of action accrued). In light of our conclusion that TGC failed to establish its limitations defense as a matter of law, we overrule its complaint.

In its second issue, TGC contends that the Trust=s breach of contract action was also barred by limitations. Breach of contract claims are generally governed by a four year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. ' 16.004 (West 1986). The statute of limitations for breach of contract begins to run when the cause of action accrues. *F.D. Stella Prods. Co.*, 857 S.W.2d at 464. Like TGC=s trespass complaint, the parties disagree on when the Trust=s breach of contract action accrued. TGC claims the cause of action accrued when the lease was breached in February 1986, and that because the Trust failed to bring a claim for breach of contract until April 6, 1992, the claim is barred. The Trust claims the lease should be treated as an installment contract, and that each time TGC failed to pay the correct amount of rent, a separate cause of action arose. We agree with the Trust.

This Court has previously held that leases should be treated as installment contracts. *See id.* at 466. We expressly concluded that a cause of action for breaching a lease accrues when each payment is due:

**18**

An installment contract under which the monthly payment is for a portion of the goods received is a classic divisible contract. So too is a lease, in which a month=s use of the lessor=s property is set off by a month=s worth of rent. Under such a lease, for each month=s use there is a new debt apportioned as monthly rent.

*Id*. at 465-66. Because the agreement between the parties is a lease, we hold that there is evidence to support the district court=s implied finding that a new cause of action accrued every year when TGC breached the lease by failing to make the correct rental payments. Accordingly, we overrule TGC=s second issue.[5]

## CONCLUSION

We affirm the district court=s judgment as far as it refuses to grant the Trust=s request for termination of the lease and awards the Trust $7,779.35 for its breach of contract and trespass claims. Because we hold that the lease provision in dispute is ambiguous, we sustain the Trust=s first issue and

---

[5] We further hold that A[b]ecause a claimant cannot bring suit for a breach of an installment contract that occurred more than four years before the suit was filed,@ the Trust is entitled only to those damages for breach of contract incurred within the four years preceding April 6, 1992. *See Haliburton v. City of San Antonio*, 974 S.W.2d 779, 784 (Tex. App.CSan Antonio 1998, no pet.) (citing *F.D. Stella Prods.*, 875 S.W.2d at 465-66). TGC does not contend and the record does not reflect that any costs associated with maintaining the Trust=s agricultural use exemption were erroneously included in the damage award because they were incurred prior to April 6, 1988; accordingly, we will not disturb the district court=s damage award.

reverse the summary judgment of the district court construing section 301(A)(3) of the lease and remand the cause for further proceedings.

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Yeakel and Puryear

Affirmed in Part; Reversed and Remanded in Part

Filed:   June 6, 2002

Publish