Reversed and Remanded; Plurality and Concurring and Dissenting Opinions
filed October 28, 2004









Reversed
and Remanded; Plurality and Concurring and Dissenting Opinions filed October
28, 2004.

 

 

In The

 

Fourteenth Court of Appeals

_______________

 

NO. 14-02-01062-CV

_______________

 

TRIBBLE & STEPHENS CO., Appellant

 

V.

 



RGM CONSTRUCTORS, L.P., Appellee

 



 

On Appeal from the County Civil Court at Law No. 3 

Harris County, Texas



Trial Court Cause No. 713,187

 



 

P L U R A L I T Y  
O P I N I O N








In this
breach of contract case, Tribble & Stephens Company (AT&S@) appeals a summary judgment in favor
of RGM Constructors, L.P. (ARGM@)[1]
on the grounds that: (1) RGM failed to comply with a contractual condition
precedent to litigation; (2) there were disputed fact issues concerning RGM=s performance under the contract; (3)
the trial court erred in: (a) sustaining RGM=s objections to T&S=s summary judgment evidence, and (b)
refusing to grant leave to amend that evidence; (4) the trial court granted RGM
more relief than requested; and (5) the trial court erred by granting RGM=s partial summary judgment motion on
T&S=s deceptive trade practices claims
and granting sanctions under the DTPA[2]
against T&S.  We hold that the trial
court erred in (1) granting RGM=s summary judgment motion because fact issues exist as to RGM=s performance under the contract; (2)
in granting summary judgment in connection with T&S=s reformation claim; and (3) in
granting RGM=s partial summary judgment motion on
T&S=s DTPA claims and in granting
sanctions on those claims against T&S. 
Further, because it is unclear whether RGM agreed to be bound by the
condition precedent as argued by T&S in its summary judgment motions, a
fact issue exists as to the parties= intent.  We reverse the judgment of the trial court
and remand.[3]

I.  Background








In 1997,
T&S, as general contractor, was hired by Remington Suites Austin, L.P., as
owner (ARemington@), to build an Embassy Suites hotel
in Austin (the Aproject@).  The agreement
between Remington and T&S was an American Institute of Architects (AAIA@) form document A101 with
modifications (the Aprime contract@). 
The prime contract incorporated by reference AIA form document A201,
entitled AGeneral Conditions of the Contract
for Construction@ (hereinafter AGeneral Conditions@). 
On August 21, 1997, T&S entered into a subcontract with RGM (the Asubcontract@), in which RGM agreed to perform the
concrete formwork[4]
on the floors and ceilings of the hotel. 
The subcontract is not a standard AIA form. 

During
the course of RGM=s work, problems arose. 
As early as November 1997, T&S notified RGM its formwork may need
remediation to correct offsets, fins, or other defects.[5]  Specifically, by letter dated November 17,
1997, T&S=s project manager, Bart Dansby,
advised RGM as follows:  

Please be reminded that the bottom of the suspended slabs on level 3
through the roof will be exposed concrete. 
We have encouraged your field personnel to be cognizant of this
condition in order to minimize the remedial work that might be necessary to correct
offsets, fins or other defects in the exposed concrete surface caused by your
formwork.

 

Subsequently, T&S
notified RGM that its work was unacceptable to the project architect, Stuart
Campbell, because the formed concrete surfaces visible to the public in some of
the guest suites and corridors exceeded the tolerances for irregularities as
required in the contract documents. 
Although RGM attempted to rectify the problems, Campbell again rejected
RGM=s work during subsequent
inspections.  








On March
19, 1998, T&S sent a letter to RGM (the Adefault letter@), in accordance with the terms of
the subcontract, advising RGM that Campbell had Arejected the quality of the exposed
to view formed concrete surface[s].@ 
The letter also stated that A[p]ursuant with specification section
03300-3.10B.1 we must direct your company to return and perform additional
repair work . . . .@  The default letter
indicated that the problem with RGM=s work was primarily with form
offsets.  Also, as permitted in the
subcontract, T&S advised RGM that if it did not begin remedial work or
establish an acceptable plan to address the problems within 72 hours, T&S
would be forced to hire a third party to perform the work on RGM=s behalf.  On March 24, T&S accepted a bid
from the painting subcontractor, Coburn & Company (ACoburn@), to float the form offsets which
T&S claimed were the result of RGM=s work.   

RGM=s project engineer, Martin Morello,
met with Campbell on March 31 to discuss the stage of completion for RGM=s work.  Campbell explained to Morello that the
offsets in the concrete surfaces needed to be smooth and level, with no abrupt
offsets.  At the meeting, Morello
did not discuss his belief that RGM had performed its work in accordance with
the contract specifications. 

In June
1998, RGM submitted pay requests No. 8 and No. 9, requesting final payment on
the contract.[6]  In September of 1998, T&S submitted
invoices to RGM for work done by Coburn, advising RGM that its share of the
costs for Coburn=s remedial work was $12,564. 
In response, RGM=s attorney sent a demand letter to T&S, informing T&S
that RGM believed its work was performed in accordance with the contract terms
and within the contract tolerances, and requesting full and final payment under
the subcontract.   








RGM
filed suit against T&S in Travis County to recover the unpaid balance of
the contract price.  Upon motion to
transfer filed by T&S, venue was transferred to Harris County.  T&S filed counterclaims against RGM for
breach of contract, breach of warranty, DTPA violations, promissory estoppel,
and indemnification.

RGM
filed a motion for partial summary judgment seeking dismissal of T&S=s DTPA claims and the trial court
granted the motion.  Subsequently, the
court also issued an order finding that T&S=s DTPA action was groundless and
granted sanctions against T&S. 
Meanwhile, both parties submitted competing motions for summary judgment
on the additional claims.  The trial
court granted RGM=s summary judgment motion and denied T&S=s motions for summary judgment.  This appeal ensued.

II.  Analysis

In two
issues, T&S argues the trial court erred in denying its motion for summary
judgment and in granting RGM=s summary judgment. 
Specifically, in its first issue, T&S contends it was entitled to
judgment as a matter of law because RGM failed to fulfill a contractual
condition precedent to litigation and RGM failed to raise any viable grounds to
defeat T&S=s right to summary judgment.  In its second issue, T&S presents five
sub-issues for our review:

!                  
Did
RGM establish entitlement to summary judgment as a matter of law?

!                  
Were there
genuine issues of material fact precluding summary judgment for RGM?

!                  
Did the trial
court err by sustaining all of RGM=s
objections and striking T&S=s evidence without first granting T&S the right to
amend its evidence as provided by Texas Rule of Civil Procedure 166a(f)?

!                  
Did the trial
court err by granting RGM more relief than it requested in its motion for
summary judgment?

!                  
Did
the trial court err by granting RGM partial summary judgment on T&S=s DTPA claims and granting sanctions
against T&S on the ground that it filed its DTPA claims in bad faith?








A.  Standard of Review

The propriety of a summary judgment is a question
of law.  Accordingly, we review the trial
court=s
decision de novo.  Natividad v.
Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994); Taub v. Aquila Southwest
Pipeline Corp., 93 S.W.3d 451, 462 (Tex. App.CHouston
[14th Dist.] 2002, no pet.).  A summary judgment is proper only
when the movant establishes that there is no genuine issue of material fact and
he is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c).  We review the summary judgment evidence in
the light most favorable to the nonmovant, indulging every inference and resolving
all doubts in his favor.  Sci.
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997); Nixon v.
Mr. Prop.  Mgmt. Co., 690 S.W.2d 546,
549 (Tex. 1985).  If the movant
establishes a right to summary judgment, the burden shifts to the nonmovant to
raise any issues that would preclude summary judgment.  Pennwell Corp. v. Ken Assocs., Inc., 123
S.W.3d 756, 760 (Tex. App.CHouston [14th Dist.] 2003, pet. denied).     

When cross-motions for summary judgment are filed,
a reviewing court examines all of the summary judgment evidence presented by
both sides, determines all questions presented, and if reversing, renders such
judgment as the trial court should have rendered.  Bradley v. State ex rel. White, 990
S.W.2d 245, 247 (Tex. 1999); Vill. of Pheasant Run Homeowners Ass=n v.
Kastor, 47 S.W.3d 747, 749B50 (Tex.
App.CHouston
[14th Dist.] 2001, pet. denied).  We may
also remand in the interests of justice. 
Lidawi v. Progressive County Mut. Ins. Co., 112 S.W.3d 725, 730
(Tex. App.CHouston [14th Dist.] 2003, no
pet.); W.W. Laubach Trust/The Georgetown Corp. v. The Georgetown Corp./W.W.
Laubach Trust, 80 S.W.3d 149, 155 (Tex. App.CAustin
2002, pet. denied).  When both parties
move for summary judgment, each party must carry its own burden and neither can
prevail due to the other=s failure
to meet its burden.  W.H.V., Inc. v.
Assocs. Hous. Fin., LLC, 43 S.W.3d 83, 87B88 (Tex.
App.CDallas 2001,
pet. denied).








B.  RGM=s Summary
Judgment

Because resolution of T&S=s first
appellate issue is dependent in part on resolution of its second issue, we
begin with T&S=s claim
that the trial court erred in granting RGM=s summary
judgment motion. 

T&S argues that RGM failed to demonstrate it
was entitled to judgment as a matter of law because there were material fact
issues regarding RGM=s
performance under the subcontract such as the extent to which the concrete work
was exposed to public view, the applicable tolerance levels for irregularities
under the contract documents, and whether RGM=s
finished work was within those tolerance levels.  Contrarily, RGM argues that when properly
construed, the contract documents establish it fully performed its contractual
obligations.  We examine the contract
documents to ascertain what performance was required and set out the contract
terms pertinent to this appeal.

1.  The Subcontract Terms

In
paragraph 1.1 of the subcontract, RGM agreed to perform the concrete formwork Asubject to the final approval of the
Architect . . . in accordance with and reasonably inferable from the Contract
Documents@ and also agreed to perform the work
as defined in those documents.  Paragraph
1.2 of the subcontract, lists the AContract Documents@ as attachments A through G.  Attachment A to the subcontract provides, in
part:

Subcontractor=s work specifically includes, but is
not limited to the following:

(SPECIFICATION
SECTION)                     (DESCRIPTION
TITLE)

Division 1                                                      General
Requirements

Division
2   Section 03100                          Concrete Formwork








Attachment B to the
subcontract, entitled ACurrent Drawings,@ sets out various drawings made a
part of the subcontract and also includes, ASpecifications/Project Manual.@ 
The Specifications from the Project Manual contain in all a listing of
16 ADivisions@ and under each Division, a number of
sections are listed.  For example:  

Division 01                General Requirements    

015                             Construction
Documents                 

040                             Coordination                                      

050                             Field
Engineering & Layout 

* * * * 

Division 02                Sitework

100                             Site
Preparation                                 

160                             Trench
Safety                         

200                             Earthwork                                           

220                             Excavating
and Backfilling   

for Structure                                      

* * * * 

Division 03                Concrete
Work

100                             Concrete
Formwork[7]                                    

200                             Concrete
Reinforcement                  

300                             Cast-in-Place
Concrete                    

* * * * 

These divisions are
standard throughout the construction industry and are promulgated by the
Construction Specifications Institute.  








Under
section 03100, the scope of RGM=s work was defined as A[p]rovide formwork for cast-in-place[8]
and precast concrete,@ as well as work defined in A[a]pplicable [s]ections of Division
3.@ 
Also, under paragraph 1.03 of section 03100, entitled AQuality Assurance,@ the following is set out:

A.        Standards:  Except as modified hereinafter, comply with
applicable provisions and recommendations of ACI-347, AGuide to Formwork for Concrete@ and ACI-301, Chapter 4, ASpecification for Structural Concrete for Buildings.@[9] 

Paragraph
1.2 in the subcontract contains what is known in the construction industry as a
Aflow down@ clause which provides:  

Subcontractor
binds himself to T&S for the performance of Subcontractor=s Work in the same manner as T&S is bound to Owner
for such performance under T&S=s
contract with Owner.[10]


2.  Construing the Contract Documents

In
construing a written contract, the primary concern of the court is to ascertain
the true intentions of the parties as expressed in the instrument.  J.M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 229 (Tex. 2003); Coker v. Coker, 650 S.W.2d 391, 393 (Tex.
1983).  To achieve this objective, we
examine and consider the entire writing in an attempt to harmonize and give
effect to all provisions of the contract so that none are rendered
meaningless.  Webster, 128 S.W.3d
at 229; Coker, 650 S.W.2d at 393. 
No single provision will be given controlling effect; rather, all
provisions must be considered with reference to the whole instrument.  Webster, 128 S.W.3d at 229; Coker,
650 S.W.2d at 393.  








We first
determine whether it is possible to enforce the contract documents as written,
without resort to parol evidence.  Webster,
128 S.W.3d at 229.  Determination of
ambiguity in a contract is a question of law for the court.  Id. (citing Coker, 650 S.W.2d
at 394); Highlands Mgmt. Co., Inc. v. First Interstate Bank of Tex., N.A.,
956 S.W.2d 749, 752 n.1 (Tex. App.CHouston [14th Dist.] 1997, pet.
denied).  A contract is unambiguous if it
can be given a definite or certain legal meaning.  DeWitt County Elec. Coop., Inc. v. Parks,
1 S.W.3d 96, 100 (Tex. 1999).  If the
contract is subject to two or more reasonable interpretations after applying
the pertinent rules of construction, the contract is ambiguous, creating a fact
issue on the parties= intent.  Webster,
128 S.W.3d at 229.  A court need not
embrace strained rules of construction to avoid an ambiguity at all costs.  Lenape Resources Corp. v. Tennessee Gas
Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996).  Instead, we construe a contract from a
utilitarian perspective, keeping in mind the particular business activity
sought to be served.  Id.  Because a fact issue arises as to the
intent of the parties when a contract contains an ambiguity, the granting of a
summary judgment is improper.  Moncrief
v. ANR Pipeline Co., 95 S.W.3d 544, 546B47 (Tex. App.CHouston [1st Dist.] 2002, pet.
denied); W.W. Laubach Trust, 80 S.W.3d at 155.  

To
determine if a contract is ambiguous, we may examine extrinsic evidence to
interpret the contractual terms used by the parties and extrinsic evidence of
the circumstances surrounding execution of the contract.  See Nat'l Union Fire Ins. Co. of
Pittsburgh v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995); Sun Oil
Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981).  However, extrinsic evidence may not
contradict or vary the meaning of the explicit language of the written
contract.  Nat=l Union Fire Ins., 907 S.W.2d at 521.  We examine that evidence only to assist us in
understanding the object and purpose of the contractual language.  Id.

3.  Did RGM establish its entitlement to summary
judgment as a matter of law?








In its summary judgment motion, and on appeal, RGM argued
that it fully complied with all of its obligations under the subcontract and,
therefore, it is entitled to be paid in full.[11]  As the movant on the issue of
performance, RGM had the burden to establish, as a matter of law, what
performance was required under the subcontract and that it fulfilled those
requirements.  See Augusta Court CoBOwners= Ass=n v.
Levin, Roth & Kasner, 971 S.W.2d 119, 122 (Tex. App.CHouston
[14th Dist.] 1998, pet. denied).  If RGM
failed to meet that burden, we must reverse the judgment and remand for further
proceedings.  Id. at 121B22.    a.         Satisfaction clause 

Notably,
the subcontract contains a Asatisfaction clause.@ 
In other words, RGM agreed to perform its work subject to the Afinal approval@ of the project architect.  








It is
well established that a contract may require performance by one party to be
subject to the satisfaction of the other party, or a designated third party
such as an architect or engineer.  See
Delhi Pipeline Corp. v. Lewis, Inc., 408 S.W.2d 295, 297B98 (Tex. Civ. App.CCorpus Christi 1966), overruled on
other grounds by Tenneco Oil Co. v. Padre Drilling Co., 483 S.W.2d
814 (Tex. 1970).  Construction contracts
commonly contain satisfaction clauses.  See,
e.g., Tex. Dep=t of Transp. v. Jones Brothers Dirt & Paving Contractors,
Inc., 92 S.W.3d 477,
481 (Tex. 2002) (listing cases addressing satisfaction clauses in construction
contracts); Black Lake Pipe Line Co. v. Union Constr. Co., 538 S.W.2d
80, 88B89 (Tex. 1976), overruled in part
on other grounds by Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex.
1989) (same).  Generally, a satisfaction
clause will be upheld unless it is shown that the arbiter of performance under
the contract decided the matter due to fraud, misconduct, or such Agross mistake@ that it implies bad faith or the
failure to exercise honest judgment.  See
Westech Eng=g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 202B03 (Tex. App.CAustin 1992, no writ); see also
Jones Brothers, 92 S.W.3d at 481 (noting the standards applicable to
satisfaction clauses); First‑Wichita Nat=l Bank v. Wood, 632 S.W.2d 210, 214 (Tex. App.CFort Worth 1982, no pet.) (noting
cases concerning an architect=s authority to pass final approval on construction
work).  However, it must appear from the
express terms of the contract that the parties intended determination by a
third party to be final; such a provision may not be implied.  Delhi Pipeline, 408 S.W.2d at
298.  

If the
architect=s satisfaction is required, we should
refrain from substituting our judgment for that of the architect.  See Jones Brothers, 92 S.W.3d at
483.  Indeed, an architect=s decision cannot be set aside by
proving that some other architect may have acted or decided an issue
differently or Asimply on a conflict of evidence as to what []he ought to
have decided.  This must be true, because
any other rule would simply leave the matter open for a court or jury to
substitute its judgment and discretion for the judgment of the [architect].@ 
Westech Eng=g,
835 S.W.2d at 203 (quoting City of San Antonio v. McKenzie Constr. Co.,
150 S.W.2d 989, 996 (Tex. 1941)).

In this
case, Paragraph 1.1 of the subcontract provides that RGM agrees to perform its
work Asubject to the final approval of
the Architect/Engineer . . . .@ (emphasis added). 
Further, in Paragraphs 2.1 and 2.4, RGM agreed that its receipt of
payment was dependent on Aacceptance and approval@ of its work by the project
architect, and in Paragraph 2.1, RGM expressly accepted the Arisk@ that the AOwner may reject all or a portion of
[RGM=s] work.@ 
Thus, under the express language of the subcontract, RGM agreed to
perform its work subject to Campbell=s Afinal approval.@ 
However, in its motion for summary judgment, RGM failed to prove that
Campbell approved its performance under the subcontract.   








On
appeal and in its response to T&S=s no-evidence summary judgment
motion, in which T&S asserted that RGM was required to perform to Campbell=s satisfaction, RGM argues that under
Paragraph 4.4 of the General Conditions, the parties were not bound to the
architect=s decision because Campbell=s decision was not Afinal and binding on the parties.@ RGM also distinguishes cases
pertaining to an architect=s satisfaction by asserting that its presentment of a claim
to the architect could not be a Acondition precedent under the
subcontract@ because the parties here had not
agreed to be bound by the architect=s decision. RGM=s argument fails for two reasons.[12]  

First,
RGM has confused the architect=s role in the two, separate issues raised in this appeal: (1)
whether RGM established as a matter of law that it fully performed under the
contract, notwithstanding the architect=s rejections of its work, and (2)
whether RGM agreed to present its Aclaims@ to the architect as a condition
precedent to this litigation.[13]  This duality in the architect=s role is not only evident from the
parties= arguments, but also under the
General Conditions in the contract.  For
example, paragraphs 4.1 and 4.2 of the General Conditions pertain to the
architect=s role in the administration of the
contract, including his approval of the work performed.  Indeed, paragraph 4.2.13 of the General
Conditions provides that the architect=s decisions on matters relating to Aaesthetic effect@ will be final.  Consequently, Campbell=s decisions concerning the quality of
work performed are distinct from paragraphs 4.3 and 4.4 of the General
Conditions, which address his role as arbiter of 








claims and disputes under
the contract documents.  As RGM
interprets the subcontract, RGM was not required to satisfy Campbell because
his decision concerning disputes was not Afinal.@ 
However, Campbell=s decision regarding disputes under paragraph 4.4 of the
General Conditions has no bearing on whether RGM agreed to perform the concrete
formwork subject to Campbell=s satisfaction.      

Another
problem with RGM=s argument is its reliance on paragraph 4.4 of the General
Conditions to support its contention that Campbell=s approval of its work was not
required.  RGM has steadfastly argued
that the General Conditions, particularly the claims and disputes provisions
under paragraph 4.4, do not apply to its subcontract.  RGM cannot avoid the claims procedure
contained under Article 4 of the General Conditions, while asserting that it is
excused from performing to Campbell=s satisfaction under those same
provisions.  If we assume the General
Conditions apply, paragraph 4.2.13, expressing that the architect=s Adecisions on matters relating to
aesthetic effect will be final@ would apply. 

Furthermore,
under the express terms of the subcontract, in the event of a conflict between
its provisions and the contract documents, the subcontract language
controls.  Because Paragraph 4.4 of the
General Conditions is in conflict with the express Afinal approval@ language of the subcontract in
Paragraph 1.1, the language of the subcontract controls and RGM is bound to
perform its work subject to Campbell=s Afinal approval.@ 
Cf. Jones Brothers, 92 S.W.3d at 482B83 (noting that all parties involved
in a construction project may not necessarily be bound by the satisfaction
clause); Black Lake Pipe Line Co., 538 S.W.2d at 88B89 (noting that the architect=s approval was not binding on the
owner, but was on the contractors). 








Neither
party directly addressed whether the finish of the formed surfaces fell within
an Aaesthetic effect@ under the prime contract or other
issues raised regarding Campbell=s satisfaction in their summary
judgment motions; however, as movant for summary judgment on the issue of
performance under the subcontract, this omission is fatal only to RGM.  See, e.g., Augusta Court, 971
S.W.2d at 122B23 (finding that unaddressed
contractual issue was fatal to summary judgment movant only).  Because RGM failed to conclusively prove it
performed to the architect=s satisfaction as required under the express terms of the
subcontract or failed to prove that Campbell=s rejection was due to fraud or
misconduct, RGM did not establish entitlement to judgment as a matter of law.[14]  See id. at 123.








Also,
when a contract requires performance to the satisfaction of an architect or
engineer, the expert testimony of that architect or engineer may be admissible
to determine if the required work was reasonably within the scope of the
contract.  See Jensen Constr. Co. v.
Dallas County, 920 S.W.2d 761, 768 & n.6 (Tex. App.CDallas 1996, writ denied) (citing Black
Lake Pipe Line Co., 538 S.W.2d at 88B89); see also Goode v.
Ramey, 48 S.W.2d 719, 721 (Tex. Civ. App.CEl Paso 1932, writ ref=d) (admitting testimony of witness
that plumbing contractor=s work met contract specifications). T&S provided an
affidavit from Campbell specifically stating he rejected RGM=s work.  RGM objected to the affidavit, claiming
various statements violated the parol evidence rule, and the trial court
sustained the objections.  However,
Campbell=s deposition, reflecting he had rejected
the formwork and that Ait was common knowledge@ RGM served as the subcontractor on
the formwork, was attached to RGM=s summary judgment motion.  Thus, RGM=s own summary judgment evidence
indicated Campbell rejected RGM=s work, raising a fact issue as to whether RGM=s performance under the subcontract
satisfied Campbell.[15]


b.  Applicable specifications

Other
fact issues exist concerning RGM=s performance under the
contract.  T&S=s March 19, 1998 default letter
specifically referred RGM to the specifications in section 03300, paragraph
3.10(B)(1.), when requesting RGM come back and perform the remedial work.  Paragraph 3.10(B)(1.) provides as follows: 

1.         Repair exposed-to-view formed concrete
surfaces, where possible, that contain defects which adversely affect the
appearance of the finish.  Remove and
replace the concrete having defective surfaces if the defects cannot be
repaired to the satisfaction of the Architect. 
Surface defects, as such, include color and texture irregularities,
cracks, spalls, air bubbles, honeycomb, rock pockets; fins and other
projections on the surface; . . .[16]  








The parties do not
dispute that the concrete surfaces at issue in this case are Aformed surfaces,@ which according to ACI-347, relied
on by RGM, equates to the Afinish of exposed concrete.@ 
Further, the work rejected by Campbell consisted of the finished
surfaces of the concrete formwork. 
However, RGM asserts that section 03300 does not apply to its work under
the contract.  Neither party addresses
whether the subcontract is ambiguous concerning the applicable
specifications.  However, reading the
contract as a whole, we find that it is ambiguous.[17]  

Attachment
A to the subcontract expressly incorporates by reference Division 1 and
Division 2 of the project specifications, as follows:  

(SPECIFICATION
SECTION)                     (DESCRIPTION
TITLE)

Division 1                                                      General
Requirements

Division 2  
Section 03100[18]                       Concrete Formwork

 

Thus, the subcontract
expressly directs RGM to the specifications found in ADivision 2 Section 03100,@ but any reference to Division 3,
covering AConcrete Formwork,@ is expressly omitted although it
clearly applies to RGM=s work.  One reasonable
interpretation of this omission is that the subcontract contains a
typographical error and the parties actually intended to refer to ADivision 3.@ 
Assuming Division 3 applies to RGM=s work, the entirety of that
Division, including section 03300, would apply.[19]  








The
conclusion that section 03300 applies to RGM=s work is supported by the fact that
the scope of RGM=s work is defined in section 03100 as providing Aformwork for cast-in-place and
precast concrete.@  Section 03300 applies
to cast-in-place concrete.  Accordingly,
that section applies to RGM=s work.  Moreover,
section 03100, 1.02(B), entitled AWork of Other Sections,@ specifically states AApplicable Sections of Division 3,@ indicating other sections of
Division 3 also apply.[20]  Finally, as a preface to the specifications
listed, the subcontract provides that RGM=s work specifically includes those
specifications listed, but is not limited to them.  Were we to conclude that only section 03100
applies, these provisions in the subcontract would be rendered meaningless.

However,
it is also reasonable to assume that the inclusion of section 03100 in the
subcontract was intended as a limitation of specifications.  Also, Division 1, entitled AGeneral Requirements,@ contains general provisions that
apply to the entire project, not just specifically to concrete formwork.  Therefore, its inclusion in the
specifications is logical.  Assuming that
Division 2 pertains to general requirements regarding the overall project, it
is equally plausible that Division 2 was intended to be referenced and the
omission of a reference to Division 3 was intended to limit the subcontract to
only Section 03100 of that Division.[21]  

In sum,
we are unable to give the specifications a definite and certain legal
meaning.  Although RGM=s work included cast-in-place
concrete, the specifications applicable to that work were not expressly set out
in the subcontract.  It is unclear if the
parties intended all the specifications under Division 3 to apply to RGM=s work or only section 03100.  Because the subcontract is ambiguous relative
to specifications for RGM=s work, a fact issue exists regarding the intent of the
parties and summary judgment in RGM=s favor was error.[22]









            c.         AExposed concrete@ 

RGM
argued in its summary judgment motion that section 03300 does not apply to its
formwork because 03300 sets forth the repair standards for defects in Aexposed-to-view@ formed concrete surfaces, as opposed
to Aexposed concrete.@ 
RGM contends the surfaces at issue were to receive an acoustical
spray-on texture because they were Aexposed concrete@ as that term is defined in the
subcontract.  Consequently, RGM contends
section 03300 is inapplicable because it pertains to Aexposed-to-view@ concrete.  However, this argument presupposes that Aexposed concrete@ surfaces under the subcontract could
not also be Aexposed-to-view@ concrete surfaces,[23]
and with this we disagree.

Section
03100, 1.03(B.) defines three types of concrete relative to the project as
follows:  

1.  Exposed Concrete: Concrete exposed-to-view on
interior and/or exterior including concrete which will receive finish
materials, such as paint and wallcovering, applied directly to its surface.  Not included is exposed concrete in
mechanical and utility rooms.

2.  Concealed Concrete: Concrete covered by
structure or with finish material other than that applied directly to its
surface.  Included is exposed concrete in
mechanical and utility rooms. 

3. 
Architectural Concrete: Same as Aexposed concrete@ except special care is taken to
achieve uniform shape, surface, texture and color.  Architectural concrete is not to be covered
with any other finish.  








Thus, the subcontract
expressly defines Aexposed concrete@ as including Aexposed-to-view@ concrete, including those surfaces
to receive a finish.[24]  Under the subcontract, the scope of RGM=s work was defined as Aexposed concrete,@ and that term expressly includes Aexposed-to-view@ concrete which is to receive a
finish.  Accordingly, we disagree with
RGM=s contention that section 03300 could
not apply to its work because it refers to Aexposed-to-view@ concrete.[25]  

In sum,
RGM failed to establish it fully performed under the subcontract as a matter of
law because it failed to present proof it performed to Campbell=s satisfaction or that his rejection
of its work was unreasonable or due to fraud, misconduct, or gross
mistake.  Also, because we find the
subcontract is ambiguous regarding the specifications applicable to RGM=s work, a fact issue exists as to the
intent of the parties.  We sustain
T&S=s subissues one and two regarding RGM=s performance.

4.  Did the Trial Court Grant RGM More Relief
than it Requested?

In its
second issue, T&S also claims the trial court erred by granting RGM more
relief than it requested.  It is well
established that a summary judgment can only be granted on the grounds
addressed in the motion.  See Tex. R. Civ. P. 166a(c); McConnell
v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex. 1993); Roof
Sys., Inc. v. Johns Manville Corp., 130 S.W.3d 430, 436 (Tex. App.CHouston [14th Dist.] 2004, no
pet.).  A judgment granting more relief
than the movant is entitled to is subject to reversal.  Lehmann v. Har‑Con Corp.,
39 S.W.3d 191, 200 (Tex. 2001).








a.  Venue

RGM
initially filed suit against T&S in Travis County.  However, in paragraph 10.1 of the
subcontract, RGM agreed that venue for all suits involving the subcontract
would be Amandatory and exclusive@ in Harris County.  T&S filed a motion to transfer venue, and
the case was subsequently transferred to Harris County.  T&S argues RGM=s Abreach@ of the venue provision was not
addressed in RGM=s summary judgment motion.  


However,
we decline to hold that RGM=s breach of the venue provision was a material breach
sufficient to sustain a separate cause of action.  T&S does not cite, and we have not found,
any authority to support its claim that a separate cause of action exists for
the breach of this venue provision.  Importantly,
to the extent the venue provision was breached, T&S sought specific performance
of that provision by filing its motion to transfer venue, and the motion was
granted.  Cf. Karagounis v. Bexar
County Hosp. Dist., 70 S.W.3d 145, 147 (Tex. App.CSan Antonio 2001, pet. denied)
(citing to Nat=l Life Co. v. Rice, 167 S.W.2d 1021, 1024 (Tex. 1943) and stating that specific
performance was relief sought because it had the effect of carrying out the
terms of the contract).  Therefore,
T&S received a remedy for any breach of the venue provision when the suit
was transferred.[26]  Accordingly, the trial court did not grant
RGM more relief than requested concerning T&S=s venue claim.    

b.  Reformation








T&S
also asserts it pleaded an alternative cause of action for reformation of the
subcontract based on mutual mistake that was not addressed in RGM=s summary judgment motion.  In its amended answer T&S pleaded that,
should the trial court determine the parties to the subcontract did not
incorporate the General Conditions of the prime contract, the failure to do so
was a result of the mutual mistake of the parties.  T&S requested the court reform the
subcontract to incorporate those provisions. 

RGM
concedes it did not address this claim in its summary judgment motion,[27]
but instead, argues that T&S asserted mutual mistake as an affirmative
defense and therefore, it was not required to address the issue.  See Gulf, C. & S.F. Ry. Co. v. McBride,
322 S.W.2d 492, 500 (Tex. 1958). 

Reformation
may be an appropriate and equitable remedy in certain breach of contract
actions.  See Nelson v. Najm, 127
S.W.3d 170, 176B77 (Tex. App.CHouston [1st Dist.] 2003, pet. denied); Howard v. INA
County Mut. Ins. Co., 933 S.W.2d 212, 219 (Tex. App.CDallas 1996, writ denied).  In a claim for reformation, a party seeks to
correct a mutual mistake made in preparing a written instrument so that the
written contract accurately reflects the original agreement of the parties.  Cherokee Water Co. v. Forderhause, 741
S.W.2d 377, 379 (Tex. 1987).  Therefore,
reformation requires an original agreement and a mutual mistake, made after the
original agreement, in reducing it to writing. 
Id.  Mutual mistake then is
a necessary element of reformation, but this does not render reformation an
affirmative defense.  See id.  








Because
RGM did not address T&S=s reformation claim in its summary judgment motion, and does
not direct us to any evidence in the record which would defeat the claim as a
matter of law, we conclude that the trial court=s grant of summary judgment on
T&S=s claim for reformation was
error.  See Rush v. Barrios, 56
S.W.3d 88, 97 (Tex. App.CHouston [14th Dist.] 2001, pet. denied) (noting to defeat
counterclaim, plaintiff must prove, as a matter of law, each element of its
cause of action and disprove at least one element of defendant=s counterclaim); Hobbs v. Hutson,
733 S.W.2d 269, 271 (Tex. App.CTexarkana 1987, writ denied) (finding reformation
counterclaim was not defeated by movant=s summary judgment
counterclaim).  Therefore, we sustain
T&S=s subissue that the trial court
granted more relief than requested.  

 

5.         Did
the Trial Court Err in Granting RGM Partial Summary Judgment on T&S=s DTPA Claims and in Granting Sanctions Against
T&S?

 

In its
second issue, T&S also argues the trial court erred in granting RGM=s partial summary judgment motion on
T&S=s DTPA claims and in granting
sanctions under that statute.

According
to T&S=s allegations, it agreed to hire RGM
only if RGM hired Tony Schroen, with Access/Formwork Design, Inc., for the
project.  T&S asserted that without
Schroen=s expertise, RGM lacked experience in
the form systems used in the project. T&S claimed that RGM began the
project with Schroen, but withheld payments from him beginning in November 1997
and eventually fired him.  T&S also
claimed it was led to believe that RGM, under Schroen=s guidance, understood the
requirements of the project and the standards applicable to its work, and that
RGM would be able to meet those requirements. 
Further, T&S alleged that RGM led T&S to believe it would hire
Coburn to perform the remedial work and pay for those costs, and that RGM would
pursue its claim through Campbell.  Based
on these allegations, T&S asserted claims against RGM for violations of the
DTPA under seven subsections of section 17.46(b).  T&S also asserted that these acts were
unconscionable under section 17.45(5) and 17.50(a)(3).








RGM
filed a AMotion for Partial Summary Judgment
on Applicability of DTPA Section 17.49(f) Exemption,@ asserting that section 17.49(f) of
the DTPA exempted the transaction between the parties because the total
contract price was over $100,000, T&S=s lawyers Astipulated that the Subcontract was reviewed
and approved,@ and the project was not T&S=s residence.  In response, T&S provided deposition
testimony from Bart Dansby, T&S=s project manager, in which he stated
he negotiated the contracts with potential subcontractors and he did not
consult with an attorney during negotiations. 
The trial court granted RGM=s partial summary judgment motion. 

Section
17.49(f) provides as follows: 

Nothing in
the subchapter shall apply to a claim arising out of a written contract if:

(1)       the
contract relates to a transaction, a project, or a set of transactions related
to the same project involving total consideration by the consumer of more than
$100,000;

(2)       in
negotiating the contract the consumer is represented by legal counsel who is
not directly or indirectly identified, suggested, or selected by the defendant
or an agent of the defendant; and

(3)       the
contract does not involve the consumer=s
residence.

 

Tex.
Bus. & Com. Code Ann. ' 17.49(f).  On appeal,
T&S argues that RGM failed to conclusively establish the second element,
that T&S was represented by an attorney during negotiations of the
contract.[28]  








During
Dansby=s deposition, RGM=s counsel questioned him about
negotiating a subcontract and noted that AExhibit No. 9 is a subcontract
agreement,@ but qualified his questions as not Aspecifically asking about RGM=s subcontract.@ 
Subsequently, RGM=s counsel was questioning Dansby about Article 10 in the
subcontract, the choice of law provision, and asked Dansby if he thought that
provision was drafted by an attorney. 
T&S=s attorney interrupted the
questioning and asked RGM=s counsel if he was trying to establish that the contract was
prepared or approved by an attorney.  RGM=s counsel responded in the
affirmative.  T&S=s attorney then stated, AWe will stipulate that [T&S=s] attorneys have reviewed and,
approved Exhibit 9.@  In subsequent deposition
testimony, not attached to the partial summary judgment motion but referred to
on appeal, a witness asserted that Exhibit 9 was a copy of RGM=s subcontract.  Based on this testimony, RGM contends T&S=s attorneys reviewed and approved the
Subcontract entered into by the parties and further asserts that the statute
does not require an attorney actively Anegotiate@ the contract.

Examining
the deposition testimony in a light most favorable to T&S, it appears that
T&S=s attorney stipulated to the fact
that its attorneys had reviewed and approved the subcontract form, but not
necessarily that T&S=s attorneys had reviewed and approved RGM=s subcontract.  It is undisputed that RGM=s subcontract had been amendedCas reflected in Attachment GCfrom the general subcontract form
during the negotiations between the parties. 
Also, were we to accept RGM=s argument on this issue, the term Anegotiate@ as used in the statute would have
little or no meaning, recognizing the fact that most form contracts are
reviewed and approved by attorneys.  

Regardless,
even assuming the stipulation pertained specifically to RGM=s subcontract, T&S produced
Dansby=s deposition testimony in which he
stated that he negotiated the contracts and did not consult with an
attorney.  At a minimum, this testimony
raises a fact issue as to whether an attorney was involved in negotiating the
subcontract.  We hold that the trial
court erred in granting RGM=s motion for partial summary judgment on T&S=s DTPA claims on the basis that the
transaction was exempted under section 17.49(f).[29]
See Cuyler v. Minns, 60 S.W.3d 209, 212 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied) (ASummary judgments must stand on their
own merits.@). 








T&S=s claims that RGM failed to perform
as required in the contract are causes of action for breach of contract.  See Crawford v. Ace Sign, Inc., 917
S.W.2d 12, 14 (Tex. 1996); Munawar v. Cadle Co., 2 S.W.3d 12, 18 (Tex.
App.CCorpus Christi 1999, pet.
denied).  However, T&S=s DTPA claims allege conduct
amounting to more than mere non-performance of the contract.  See Munawar, 2 S.W.3d at 19.  AThe determination of whether a breach
of contract rises to the level of a misrepresentation sufficient to trigger the
DTPA is a fact‑driven inquiry.@ 
Id. at 18.  Once those
facts are known, whether they constitute a DTPA misrepresentation is a question
of law.  Id.  

Here,
T&S claims that it was induced to enter into the subcontract due to
representations by RGM that it would use Schroen on the project.  See Tex.
Bus. & Com. Code Ann. ' 17.46(b)(5) (prohibiting
representations that goods or services have qualities or sponsorship which they
do not have).  RGM did not attack the
merits of T&S=s DTPA claims. Consequently, RGM failed to establish as a
matter of law that T&S could not recover under this claim or that the claim
is only a breach of contract claim. 
Because we hold the trial court erred in granting partial summary
judgment to RGM on T&S=s DTPA claims, we also conclude that the trial court erred in
granting sanctions against T&S on its DTPA claims.  We sustain T&S=s sub-issue on this matter.  

In
conclusion, regarding T&S=s second issue on appeal, we hold that the trial court erred
in (1) granting RGM=s summary judgment because RGM failed to establish as a
matter of law that it fully performed under the subcontract and fact issues
exist as to RGM=s performance, (2) granting summary judgment in connection
with T&S=s reformation claim, and (3) granting
RGM=s partial summary judgment motion on
T&S=s DTPA claims and granting sanctions
on those claims against T&S. 
Accordingly, we sustain T&S=s second issue on appeal.  

C.  T&S=s Summary Judgment Motions








T&S
also argues that the trial court erred in denying its summary judgment motions because
RGM failed to comply with a contractual condition precedent.[30]  According to T&S, RGM was required under
the subcontract to present its claimCthat the requested remedial work was
outside the scope of its work under the subcontractCto T&S, and under provisions in
the prime contract, T&S would, in turn, submit the claim to the owner.  T&S asserts that RGM=s presentment was a condition
precedent to RGM=s filing the subject suit. 
T&S relies, in part, on the argument that the provisions at issue
are standard contractual terms within the construction industry and therefore,
we must construe these provisions in a manner consistent with other jurisdictions.  T&S also asserts that, unlike other
contracts, construction contracts contemplate change during the course of the
project and change generates dispute. 
Therefore, according to T&S, an efficient method of handling these
changes and disputes is necessarily required to convert a two-dimensional
drawing into a three-dimensional building. We examine T&S=s arguments.

1.  Standard of Review 

We
previously set forth the standard of review applicable to traditional summary
judgment motions.  In addition, after
adequate time for discovery, a party may move for summary judgment on the basis
that there is no evidence of an essential element of the nonmovant=s cause of action.  Tex.
R. Civ. P. 166a(i).  The motion
must state the elements for which there is no evidence.  Id.; Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 207 (Tex. 2002).  The trial court must grant the motion unless
the nonmovant produces summary judgment evidence that raises a genuine issue of
material fact.  Tex. R. Civ. P. 166a(i) cmt.; S.W. Elec. Power Co. v.
Grant, 73 S.W.3d 211, 215 (Tex. 2002); Russo v. Smith Int=l, Inc., 93 S.W.3d 428, 433 (Tex. App.CHouston [14th Dist.] 2002, pet.
denied).  A no‑evidence summary
judgment is proper if the respondent fails to adduce more than a scintilla of
probative evidence in support of one or more essential elements of a
claim.  See Tex. R. Civ. P. 166a(i).








2.  Contract Terms

T&S
argues that RGM agreed to fulfill the same duties and remedies to T&S that
T&S owed to the owner, and specifically, the Acondition precedent@ provision in General Conditions,
paragraph 4.3.2, which provides:

4.3.2  Decision of Architect.  Claims,
including those alleging an error or omission by the Architect, shall be
referred initially to the Architect for action as provided in Paragraph
4.4.  A decision by the Architect, as
provided in subparagraph 4.4.4. shall be required as a condition precedent to
arbitration or litigation of a Claim between the Contractor and Owner as to
all such matters arising prior to the date final payment is due, regardless of
(1) whether such matters relate to execution and progress of the Work or (2)
the extent to which the work has been completed.

(emphasis added).  This standard AIA provision is generally
accepted to be an alternative dispute resolution mechanism which is Avalid, enforceable and favored as a
matter of public policy.@  See Zandri Constr.
Corp. v. Wolfe, 737 N.Y.S.2d 400, 402 (N.Y. App. Div. 2002). 

T&S
argues that RGM agreed to be bound by paragraph 4.3.2 through the Aflow down@ provision in the subcontract,
Paragraph 1.2(b), which provides in part: 

Subcontractor
binds himself to T&S for the performance of Subcontractor=s Work in the same manner as T&S is bound to Owner
for such performance under T&S=s
contract with Owner.  T&S=s contract with owner, excluding financial data, and
all other Contract Documents listed above[31]
have been made available to and read by Subcontractor.  In case of conflict between this Subcontract
and the other Contract Documents, Subcontractor shall be bound by [this
subcontract agreement].[32]  








Contrarily, RGM argues
that the flow down provision of the subcontract pertains only to the
performance of its work and does not incorporate the dispute resolution
provision of General Conditions; therefore, according to RGM, it was not an
express condition precedent to its breach of contract action.

3.  Analysis

In
Texas, under general principles of contract law, separate agreements may be
incorporated by reference into a signed contract.  See Trico Marine Servs., Inc. v. Stewart
& Stevenson Technical Servs., Inc., 73 S.W.3d 545, 549 (Tex. App.CHouston [1st Dist.] 2002, orig.
proceeding); Ikon Office Solutions, Inc. v. Eifert, 2 S.W.3d 688, 693
(Tex. App.CHouston [14th Dist.] 1999, no
pet.).  The language used to incorporate
a document is not important provided the signed document plainly refers to the
incorporated document.  Owen v.
Hendricks, 433 S.W.2d 164, 167 (Tex. 1968); Trico, 73 S.W.3d at
549.  However, the doctrine does not extend
to documents that simply appear to relate to the same transaction.  Owen, 433 S.W.2d at 167; Trico,
73 S.W.3d at 549B50 (holding that mentioning of AGeneral Terms and Conditions of Sale@ in table of contents and a heading
was not sufficient reference to incorporate). 
When a document is incorporated into another by reference, both
instruments must be read and construed together.  In re C & H News Co., 133 S.W.3d
642, 645B46 (Tex. App.CCorpus Christi 2003, orig.
proceeding).

a.  AFlow-down@ provision and incorporation by
reference 








A flow
down provision is a closely related concept to incorporation by reference.  See T. Bart Gary, Incorporation by
Reference and Flow-Down Clauses, 10
Construction Law. 1, August 1990, at *46.  Both types of provisions are common in
construction contracts because, generally, those contracts are characterized by
the large number of documents involved.  Id.
at 44.[33]

In Guerini
Stone Co. v. P.J. Carlin Constr. Co., a subcontract directed work be
performed in a manner Aagreeable to the drawings and specifications.@ 
240 U.S. 264, 265 (1916).  The
Supreme Court held that reference to the prime contract in a subcontract for a
particular purpose, makes the prime contract a part of the subcontract only for
the purpose specified.  See id. at
277.  Other courts have followed this
precedent.  See, e.g., H.W.
Caldwell & Son, Inc. v. United States ex rel. John H. Moon & Sons, Inc.,
407 F.2d 21, 23 (5th Cir. 1969) (same, suit involved Miller Act); Washington
Metro. Area Transit Auth. v. Norair Eng=g Corp., 553 F.2d 233, 235 (D.C. Cir. 1977)
(same, suit involved Miller Act); A.F. Lusi Constr., Inc. v. Peerless Ins.
Co., 847 A.2d 254, 261 (R.I. 2004) (construing Ato the extent of the Work to be
performed by Subcontractor@ as not applying to insurance requirements under the prime
contract); see also Seale v. Roy M. Mitchell Contracting Co., 321 S.W.2d
149, 150B51 (Tex. Civ. App.CAustin 1959, writ ref=d) (finding that phrase Apertaining to his part of the work@ did not incorporate the arbitration
provision in the prime contract).  








However,
other courts examining flow down provisions have found that the administrative
clauses within the prime contract, such as arbitration clauses, are
incorporated into the subcontract.  See,
e.g., Turner Constr. Co. v. Midwest Curtainwalls, Inc., 543 N.E.2d
249, 252 (Ill. App. Ct. 1989) (finding that flow down obligations of
subcontractor were not limited to the work to be performed); J.S. & H.
Constr. Co. v. Richmond County Hosp. Auth., 473 F.2d 212, 214B15 (5th Cir. 1973) (finding incorporation
by reference and distinguishing contrary cases as those involving the Miller
Act).  In these latter cases, the
contract provisions contained a specific reference to or incorporation of those
obligations or documents flowing down to the subcontractor.  See, e.g., Turner Constr., 543
N.E.2d at 252 (defining AContract Documents@ as including the Ageneral conditions@ of the prime contract); J.S.&H.
Constr., 473 F.2d at 213B16 (finding arbitration clause applied to subcontractor
because subcontract incorporated by reference the general conditions of the
prime contract and contained flow down provision).  Here, we find no such specific incorporation
of dispute resolution provisions within the subcontract.

Paragraph
5.3.1 of the General Conditions provides the following:

5.3       SUBCONTRACTUAL
RELATIONS

5.3.1 By written agreement, for validity, the Contractor
shall require each Subcontractor, to the extent of the work to be performed
by the Subcontractor, to be bound to the Contractor by terms of the
Contract Documents and to assume toward the Contractor all the obligations and
responsibilities which the Contractor, by these Contract Documents, assumes
toward the Owner and Architect.  Each
subcontract agreement shall preserve and protect the rights of the Owner and
Architect under the Contract Documents with respect to the Work to be performed
by the Subcontractor so that subcontracting thereof will not prejudice such
rights . . . . 

(emphasis added). This
provision is not self-executing. 
Instead, it puts the burden on the contractor to obtain a written
agreement from the subcontractor in which the subcontractor assumes the same
responsibilities towards the contractor that the contractor has assumed towards
the owner.  See MPACT Constr. Group,
LLC v. Superior Concrete Constructors, Inc., 802 N.E.2d 901, 908B09 (Ind. 2004).  In MPACT Construction Group, the
Indiana Supreme Court examined a dispute involving provisions mirroring those
at issue here.  See id.  The Indiana court noted the following, which
we find instructive: 








A comment
from the [AIA], drafters of the General Conditions, provides some
guidance.  It first states, AA basic requirement of the contract is that
subcontractors be bound by the terms of the contract documents.  AIA Document A401 Standard Form Agreement
Between Contractor and Subcontractor, so provides.@  But the next
sentence reads, AIf other subcontract forms are utilized, care must be
taken to coordinate them with Subparagraph 5.3.1.@  This indicates that if the general contractor
uses subcontract forms other than those provided by the AIA . . . it must in
its own contract include a provision requiring the subcontractors to assume the
same responsibilities that it assumes toward the owner.   

Id. at 909.  Similar to the contractor in MPACT,
although T&S may have thought its flow down provision sufficed to bind RGM
to the Acondition precedent@ provision, because the subcontract
lacks language incorporating the General Conditions of the prime contract into
the subcontract, we cannot conclude that RGM was bound to the condition
precedent provision.  Also, paragraph 8.1
in the subcontract states: AT&S agrees to be bound to Subcontractor by all the
obligations that Owner assumes to T&S under the Contract Documents and by
all provisions thereof affording remedies and redress to T&S from Owner
insofar as applicable to this Subcontract.@ 
However, there is no reciprocal provision within the subcontract,
binding RGM to T&S.  Thus, it is
reasonable to conclude that the parties had not intended RGM would be bound to
T&S in the same manner T&S was bound to RGM. 








T&S
also argues that the project manual, as referenced in Attachment B to the
subcontract, fully incorporates the provisions of the General Conditions.  Specifically, the reference to the project
manual in Attachment B states, ASPECIFICATIONS/PROJECT MANUAL.@ 
A mere reference to another document is insufficient to establish a
wholesale incorporation of the referenced document.  See Trico, 73 S.W.3d at 550.  Further, because this reference identifies Aspecifications@ in connection to the project manual,
set off with a slash, a reasonable construction is that the project manual was
incorporated only to the extent of the specifications.[34]  This heading is, at best, ambiguous.  See id. 
(noting that a Aheading@ within a contract may be ambiguous if it is unclear whether
it is a heading or a contractual term).[35]  

Accordingly,
because the flow down provision in the subcontract is limited to the
performance of RGM=s work, we cannot conclude as a matter of law that RGM agreed
to be bound to the Acondition precedent@ provision by virtue of the flow down
provision.  

b.  Claims for Aextra compensation@

Nevertheless,
examining the entire subcontract, it is clear that RGM did have some obligation
to submit claims to T&S in reference to the General Conditions.  RGM expressly agreed to submit claims for
extra compensation and extensions of time to T&S.  Paragraph 4.4 of the subcontract, under AChanges in the Work,@ provides as follows: 








Subcontractor
will make all claims for extra compensation and extensions of time to T&S
promptly in accordance with this Article and consistent with the Contract
Documents.  Subcontractor agrees that the
time listed in the Contract Documents within which notice must be given for a
claim or any appeal is reduced by five (5) days for all notices submitted by
Subcontractor.  T&S agrees to pursue
reasonable claims submitted by Subcontractor against Owner under the provisions
of the Contract Documents.[36]  Subcontractor shall be responsible for
preparation of the claims and for all legal and other costs incurred by
T&S.   

Thus, RGM agreed to make
any claims Afor extra compensation@consistent with the prime
contract.  T&S also argues that the
dispute resolution provision is incorporated by reference through this
language.[37]

Even
assuming RGM had agreed to submit claims in accordance with the General
Conditions, by the plain language of the subcontract, RGM agreed to submit only
those claims dealing with extra compensation.[38]  Because we interpret words contained in a
contract according to their plain and ordinary meaning, Aextra compensation@ implies compensation given beyond
the contract price.  Sun Operating,
Ltd. v. Holt, 984 S.W.2d 277, 285 (Tex. App.CAmarillo 1998, pet. denied); see
Rhoads Drilling Co. v. Allred, 70 S.W.2d 576, 582 (Tex. 1934) (dealing with
payment for ex officio services, finding Aextra compensation@ means any sum given in addition to
the contract price or salary). 
Therefore, whether RGM=s claim is one for Aextra compensation@ can only be determined in reference
to the scope of RGM=s work as defined in the subcontract.  As we have previously determined, the
subcontract is ambiguous as to the scope of RGM=s work.  Consequently, the question of whether RGM was
required to submit this claim to T&S prior to filing suit hinges on
disposition of the ambiguous language.   









RGM
argues that it is seeking only to be paid for the full amount of the contract
and not for any payment outside the contract; therefore, RGM contends this is
not a claim for extra compensation. 
However, we reject this distinction. 
Here, the subcontract clearly anticipated that the project may require
adjustment or changes in the work. 
Indeed, the Aextra compensation@ clause is contained in Article 4 of
the subcontract, entitled AChanges in the Work.@ 
Also, the subcontract provides that a subcontractor is to carry on any
work and maintain progress during any dispute. 
Paragraph 4.1 of the subcontract expressly states that T&S and RGM Aagree that T&S may add to or
deduct from the amount of Work covered by this subcontract . . . .@ Thus, when the subcontract is read
in its entirety, Aextra compensation@ pertains to Achanges@ in the work, whether adding to or
deducting from the amount of work covered by the subcontract.  See Coker, 650 S.W.2d at 393 (stating
contract must be construed in its entirety); see also Cook Composites, Inc.
v. Westlake Styrene Corp., 15 S.W.3d 124, 131B32 (Tex. App.CHouston [14th Dist.] 2000, pet. dism=d). 
Although RGM characterizes its claim as something other than Aextra compensation,@ RGM is in fact contending that
T&S is wrongfully holding the contract amount due because T&S
wrongfully required RGM to perform work outside the scope of the contract. 








However,
the subcontract expressly provides that RGM is to present claims Ain accordance with@ the subcontract, yet merely Aconsistent with@ the Contract Documents.  Had the parties intended a wholesale
incorporation of the AClaims and Disputes@ provisions in the General
Conditions, the reference to the subcontract claims provisions would be
superfluous.  Indeed, had the parties
intended the result T&S proffers, they could have easily used the
phrase:  Ain accordance with the Contract
Documents.@ 
Moreover, the term Aconsistent with@ implies that RGM agreed to submit
its claims only in a manner that was not contrary to the contract documents;
these terms do not necessarily indicate RGM agreed to the condition precedent
provision.  Therefore, the reference to
the prime contract is ambiguous[39]
and creates a fact issue concerning the parties= intent on this issue.[40]

In sum,
the subcontract is, at best, unclear as to whether RGM agreed to submit its
claims for extra compensation to T&S as a condition precedent to
litigation.  Moreover, whether RGM=s claim is one for Aextra compensation@ can only be determined with
reference to RGM=s scope of work as defined in the subcontract, which we
previously determined was ambiguous.  In
light of our conclusions relative to T&S=s first issue, we remand to the trial
court for further proceedings consistent with our disposition.  Because we remand, our discussion of RGM=s affirmative defenses concerning the
condition precedent will be relatively brief.[41]

c.  RGM=s asserted Acondition precedent@ defenses








After
RGM filed suit, T&S filed a supplement to its original answer denying that
RGM had satisfied all conditions precedent and specifically asserting RGM
failed to present its claim to the architect prior to any litigation.[42]  RGM claims that by delaying its assertion of
the condition precedent and, during that delay, litigating the issues of RGM=s performance, T&S waived the
condition precedent.

Waiver
is an intentional relinquishment of a known right or intentional conduct
inconsistent with that right.  Jernigan
v. Langley, 111 S.W.3d 153, 156 (Tex. 2003); Comsys Info. Tech. Servs.,
Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 189 (Tex. App.CHouston [14th Dist.] 2003, pet.
granted).  Generally, waiver is a
question of fact.  Comsys Info.,
130 S.W.3d at 190.  However, if facts and
circumstances are admitted or clearly established, it then becomes a question
of law.  Id.

T&S
did in fact defend the suit for some time prior to asserting the condition
precedent; however, RGM does not cite to any authority in support of its claim
that this delay amounts to waiver of the condition precedent.  Civil Procedure Rule 54, which governs the
pleading of conditions precedent, does not address when a condition precedent
is timely asserted.  See Tex. R. Civ. P. 54.[43]  Moreover, T&S amended its answer, adding
the specific denial of the condition precedent in a timely manner under Civil
Procedure Rule 63, which governs the amendment of pleadings.  See Tex.
R. Civ. P. 63 (stating pleadings are amended timely if they do not
operate as a surprise and, if within seven days of trial, with leave of the
court).  Therefore, we do not agree that
T&S=s delay in asserting the condition
precedent evidences an intentional relinquishment of the right to assert it.

We are
not concluding that a condition precedent cannot be waived because of a delay
in making a specific denial.  We merely
conclude that, under the circumstances of this case, T&S=s delay in asserting the condition precedent
does not establish waiver as a matter of law. Instead, we hold that whether
T&S knowingly relinquished the right is a fact question.  








This
conclusion applies to RGM=s claim that laches bars T&S=s right to rely on the condition
precedent.  Laches is an equitable
affirmative defense that requires proof of (1) an unreasonable delay by a party
having legal or equitable rights in asserting those rights, and (2) a good
faith change of position by another to his detriment because of the delay.  Lawrence v. Lawrence, 911 S.W.2d 443,
449 (Tex. App.CTexarkana 1995, writ denied).  Delay alone will not constitute laches,
injury or prejudice must also be established. 
Id.  Laches is a question
of fact that should be determined by considering all of the circumstances in
each particular case.  See Williams v.
Nevelow, 501 S.W.2d 942, 948 (Tex. Civ. App.CSan Antonio 1973), rev'd on other
grounds, 513 S.W.2d 535 (Tex. 1974). 

RGM
provided evidence of attorneys= fees incurred from November 1998 to January 2001, when
T&S asserted the condition precedent. 
This evidence raises a fact issue as to RGM=s change of position.  Whether T&S=s delay in asserting the condition
was sufficient to constitute laches is also a fact question.[44]

In sum,
even assuming RGM was bound to the condition precedent provision, fact issues
exist as to the affirmative defenses raised by RGM regarding the condition
precedent. 

III.  Conclusion








In
conclusion, the trial court erred in granting summary judgment in RGM=s favor because RGM did not provide
proof that it performed to the architect=s satisfaction and other fact issues
exist concerning its performance under the subcontract.  The trial court also erred in granting RGM
more relief than requested on T&S=s reformation claim.  Further, the trial court erred in granting RGM=s partial summary judgment on T&S=s DTPA claims and in granting
sanctions against T&S on those claims. 
We conclude the trial court properly denied T&S=s motions for summary judgment
because fact issues exist as to the intent of the parties to bind RGM to the
condition precedent provision in the General Conditions, and to the other
issues raised in connection with T&S=s reliance on the condition
precedent.  Accordingly, we reverse the
trial court=s judgment and remand for further
proceedings consistent with this opinion. 

/s/        Charles
W. Seymore

Justice

 

Judgment
rendered and Plurality and Concurring and Dissenting Opinions filed
October 28, 2004.

 

Panel
consists of Justices Edelman, Frost, and Seymore.  (Frost, J., concurring and dissenting.)  (Edelman, J., concurs in result only.) 

 

 

 











[1]  T&S had
also filed third-party claims against Fidelity & Guaranty Insurance
Underwriters, Inc. (AFidelity@), the
company that issued the performance bond on RGM=s
work.  Fidelity=s liability was resolved by the parties through an
agreed stipulation, and the trial court issued a take-nothing judgment against
T&S in favor of Fidelity.  There are
no issues presented in this appeal concerning Fidelity=s liability.





[2]  See Tex. Bus. & Com. Code Ann. '' 17.41B.506 (Vernon 2002 & Supp. 2004) (hereinafter ADTPA@).





[3]  In a
supplemental brief, T&S also requests that we affirm the trial court=s judgment, and reform it to reflect prejudgment
interest at a rate of 5%, in compliance with House Bill 2415.  See Act of June 2, 2003, 78th Leg.,
R.S., ch. 676, ' 1, sec. 304.003(c), 2003 Tex. Gen. Laws 2096, 2096B97 (amended 2003) (current version at Tex. Fin. Code Ann. ' 304.003(c) (Vernon Supp. 2004)).  Because we reverse and remand, we do not
address T&S=s request for reformation of the judgment. 





[4]  Concrete
formwork consists of pouring wet concrete into Amolds@ made with pieces of plywood.  The concrete dries to form the particular
mold.  





[5]  For
edification, an offset is an indentation in the concrete surface
resulting from displaced, mismatched, or misplaced forms.  A fin is a protrusion in the formwork.  Both are Aabrupt@ changes in the concrete=s
surface.  Notably, there are abrupt and
gradual irregularities occurring in concrete formwork.  Abrupt irregularities are measured where they
stand.  Contrarily, a gradual
irregularity occurs, and is measured, over a plane surface, typically over a
ten foot span.  Gradual irregularities
result from warping and other similar uniform variations from planeness or true
curvature.  They are an anticipated
result in formwork, arising because no structure is said to be a truly flat,
plumb, or level surface.  A Atolerance@ is a
variation from a given dimension, location, or alignment.  Gradual irregularities are subject to
tolerances specified in the construction documents for a project.  Abrupt irregularities may also be subject to
tolerances, depending upon the needs of the particular project.  Regardless of its classification as abrupt or
gradual, if an irregularity in the concrete surface is within a tolerance
specified in the contract documents, it is not a Adefect.@ 





[6]  The contract
price was originally $317, 715.  With
approved change orders, the total contract price was $345,944.65. RGM claims
the full amount owed under the contract is $24,165.50.  





[7]  Accordingly,
section 03100 referenced in Attachment A contains the specifications
corresponding to ADivision 03, section 100, concrete formwork@ set forth in the project manual.





[8]  The
specifications for cast-in-place concrete are found in Division 03 - 300; in
other words, section 03300.  





[9]  The American
Concrete Institute (AACI@) publishes various specifications and guidelines for
use in the construction industry. 





[10]  Remaining
provisions of the Subcontract will be set forth in full when necessary to our
discussion. 





[11]  RGM pleaded
substantial performance as an alternative theory of recovery in its petition
and also argued substantial performance in its motion for summary
judgment.  The substantial performance
doctrine allows a party to bring a contract action to recover the full
performance price, less the cost of remedying any defects that can be
repaired.  Smith v. Smith, 112
S.W.3d 275, 278B79 (Tex. App.CCorpus
Christi 2003, pet. denied) (citing Vance v. My Apartment Steak House, Inc.,
677 S.W.2d 480, 482B83 (Tex. 1984)). 
A contractor suing on a contract for substantial performance bears the
burden of proving that he substantially performed, the sum owed to him under
the contract, and the cost of remedying the defects due to his errors or
omissions.  Weitzul Constr., Inc. v.
Outdoor Environs, 849 S.W.2d 359, 363 (Tex. App.CDallas 1993, writ denied).  RGM argued in its summary judgment motion
that there was a fact issue as to the appropriate cost to remedy any alleged
defects, and the trial court awarded the full remaining contract price to
RGM.  On appeal, RGM argues only that it
fully performed under the contract and does not argue any substantial
performance issues.  See Nabors Corp.
Servs., Inc. v. Northfield Ins. Co., 132 S.W.3d 90, 100 (Tex. App.CHouston [14th Dist.] 2004, no pet.) (concluding
argument abandoned on appeal). 
Accordingly, we do not address the issue of whether RGM substantially
performed under the subcontract.  See
Provident Life & Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex.
2003) (noting summary judgment can only be affirmed on meritorious grounds
specifically presented to the trial court and properly preserved for
appellate review).





[12]  In its
response, RGM also argued that its claim in this case was not that Campbell
wrongfully rejected its work, but that T&S wrongfully identified work
outside the scope of RGM=s subcontract. 
If, as evidenced by the language of the subcontract, RGM=s work was to be performed to the satisfaction of the
architect and the architect rejected RGM=s work,
RGM=s distinction of its argument is immaterial.  This is particularly true because RGM moved
for summary judgment, claiming it had fully performed under the subcontract and
had the burden to prove performance as a matter of law.  As support for this argument, RGM included
testimony from Campbell that he was not aware of the terms of the
subcontractors= contracts; however, Campbell also testified that Ait was common knowledge@ that
RGM was doing the formwork and he specifically found that the formwork was not
within the contract specifications.     





[13]  We discuss the
condition precedent issue in a subsequent portion of this opinion.  See Section C. infra.   





[14]  On appeal, RGM
contends that T&S waived the argument that it had to perform to the
satisfaction of Campbell because T&S did not address that assertion in its
initial brief.  We disagree.  T&S=s
evidence of Campbell=s rejection of RGM=s work
was excluded by the trial court based upon RGM=s
objections.  In its initial brief,
T&S argued that this evidence had been erroneously excluded, stating:

 

Mr. Campbell did not offer testimony at variance with
the language of the contract.  He
testified from personal knowledge as to the facts surrounding his actions in
his capacity as project architect.  That
testimony went to the heart of the parties= factual
dispute and therefore, was admissible.  AContract terms are not changed when the architect
decides in the course of a job what a specification means or whether one
specification trumps another.@ In fact, this case cannot be tried without the
evidence that, rightly or wrongly, Mr. Campbell rejected RGM=s work, and no one is better qualified to offer that
evidence than Mr. Campbell, himself. 

 

(citations omitted). 
Although couched in an evidentiary context, T&S did argue that
Campbell=s rejection of the work was the pivotal issue in the
case and could not be resolved without his testimony.  Also, the quotation relied on by T&S in
support of its statement comes from a Massachusetts case dealing with an
architect=s decisions concerning the quality of work.  See Fontaine Bros. v. City of Springfield,
617 N.E.2d 1002, 1004 (Mass. App. Ct. 1993). 





[15]  Because
Campbell=s rejection of RGM=s work
was reflected in RGM=s summary judgment evidence, we do not address T&S=s subissue three on appeal regarding the trial court=s rulings on the admissibility of Campbell=s statements.  





[16]  RGM objected
to T&S=s inclusion of the section 03300 specifications in its
summary judgment evidence, but RGM attached these specifications to its motion
for summary judgment as exhibit 35.  





[17]  A court may
conclude that a contract is ambiguous even in the absence of such a pleading by
either party.  St. Paul Ins. Co. v.
Tex. Dept. of Transp., 999 S.W.2d 881, 887 n.5 (Tex. App.CAustin 1999, pet. denied) (citing Sage Street
Assocs. v. Northdale Const. Co., 863 S.W.2d 438, 445 (Tex. 1993)). 





[18]  In referring
to the specifications, the dissent states Athe
Subcontract directs RGM to >Specifications Section 3100 of the Contract Documents.=@ However, the dissent quotes the appellee=s brief and not the subcontract.  The terms of the subcontract regarding the
specifications are set forth above.  In
particular, the subcontract contains the following language pertinent to RGM=s work: Aspecifically
includes, but is not limited to . . .@ the specifications found in Division 1, entitled AGeneral Requirements,@ and
Division 2, Section 03100, AConcrete Formwork.@  As explained in this plurality opinion,
Section 03100 is not found in Division 2, but rather in Division 3 of the
project manual.  Division 3, entitled AConcrete Work,@ also
contains section 03300, which pertains to ACast-in-Place
Concrete.@  RGM=s work was defined in the subcontract as providing Aformwork for cast-in-place and precast
concrete.@  (Emphasis
added).        





[19]  We
respectfully disagree with the dissent=s
conclusion that only section 03100 applies to RGM=s
work.  As noted, under the express
language of the contract, RGM=s work included cast-in-place concrete and the project
manual specifications applicable to cast-in-place concrete are in section
03300. 





[20]  Paragraph 16
of Attachment A also indicates that if the specifications are not sufficiently
detailed, the better quality of work should apply, and section 03300 requires a
higher level of finish than does section 03100.





[21]  Division 2 in
the specifications, entitled ASitework,@ may or
may not address requirements of the entire project.  The parties do not address the application of
Division 2 to RGM=s work. 





[22]  Having found a
fact issue as to the scope of RGM=s work,
we reject RGM=s argument that T&S committed the first material
breach of the subcontract by sending the March 19, 1998 letter requesting RGM
to perform, what RGM characterizes as Aextra
work without extra compensation.@ 





[23]  In some of the
ACI publications in the record, there is a distinction between exposed-to-view
concrete and exposed concrete.  However,
the definitions in section 03100 control over those publications by virtue of
the language in paragraph 1.03(A.) of the subcontract.





[24]  We note, in
his deposition testimony, Campbell also stated that the areas at issue were
required to have an Aarchitectural finish concrete@ because they were Aexposed
to view.@  We do not
address whether the finish was an architectural finish because the subcontract
does not indicate, and T&S does not argue, that it was.





[25]  Section 03300,
3.06(B.)(1.) provides as follows:

 

Provide as-cast smooth form finish for formed concrete
surfaces that are to be exposed-to-view, or that are to be covered with a
coating material applied directly to the concrete, or a covering
material bonded to the concrete such as waterproofing, dampproofing, painting,
or other similar system.   

 

(emphasis added). 
In this case, the acoustical spray-on texture was to be applied directly
to the undersides of the slabs.  Thus,
applying section 03300 to RGM=s work would not be inconsistent with those
definitions in section 03100.





[26]  The election
of remedies doctrine precludes T&S from attempting to sustain a cause of
action for money damages for the breach of the venue provision.  See Star Houston, Inc. v. Shevack, 886
S.W.2d 414, 422 (Tex. App.CHouston [1st Dist.] 1994), writ denied per curiam, 907
S.W.2d 452 (Tex. 1995) (AA party who seeks redress under two or more theories
of recovery for a single wrong must elect, before the judgment is rendered,
under which remedy he wishes the court to enter judgment.@).





[27]  RGM states in
its brief that T&S=s answer adding reformation was filed after RGM had
filed its summary judgment motion.  RGM
does not claim the pleading was untimely filed nor does the record reflect that
it was.  





[28]  The parties do
not dispute that T&S purchased RGM=s
construction services.   





[29]  Moreover,
without addressing the propriety of RGM=s
incorporation of the entire record in response to T&S=s motion to reconsider the trial court=s order on the partial summary judgment, we do not
agree with RGM=s contentions that there is absolutely no support for
T&S=s DTPA claims in the entire record of the case.   





[30]  T&S filed
a no-evidence summary judgment motion arguing there was no genuine issue that
RGM failed to present any claim to T&S or the architect within the time
period required under the subcontract. 
T&S filed a AMotion for Final Judgment,@ asserting that its supplemental evidence established
RGM judicially admitted that it did not file a claim.  The trial court denied both motions.  





[31]  The AContract Documents listed above@ refers to attachments to the subcontract, A through
G. 





[32]  This
subcontract provision is not a standard AIA clause and the bracketed language
reflects agreed upon changes to the subcontract form used, added through the
language of Attachment G, ASubcontract Amendments.@





[33]  Incorporation
by reference and flow down provisions conveniently serve to incorporate a
number of documents into a single contract. 
T. Bart Gary, Incorporation by Reference and Flow-Down Clauses, 10 Construction Law.  1, August 1990, at *46.  As well as being convenient, these provisions
also Arepresent efforts to ensure consistency of obligations
throughout the various tiers of the contracting process.@  Id.  Therefore, as argued by T&S, we should
strive to construe a flow down provision in a manner consistent with other
jurisdictions because those provisions are commonly used in construction
contracts across jurisdictions.  See
also Nat=l Union Fire Ins. Co., 907 S.W.2d at 522 (noting that courts construe
insurance contracts consistent with other jurisdictions because the provisions
are identical across jurisdictions).





[34]  This
interpretation would be consistent with the conclusion that RGM agreed to be
bound to the extent of its work to be performed.  





[35]  T&S did
argue that the administrative provisions of the General Conditions were
incorporated into the subcontract through reference to ADivision 01," specifically set forth in
Attachment A to the subcontract. 
According to T&S, under Division 01, tab 1015 in the project manual,
entitled AConstruction Documents,@ there
is language specifically incorporating the General Conditions.  However, as noted by RGM, this specific
argument has not been preserved for our review because T&S failed to raise
the argument in its initial appellate brief. 
See Tex. R. App. P. 38.1(h),
38.3; Triad Home Renovators, Inc. v. Dickey, 15 S.W.3d 142, 146 (Tex.
App.CHouston [14th Dist.] 2000, no pet.) (finding that
argument raised in reply brief was not preserved). Moreover, the provisions
within the project manual supporting T&S=s
incorporation by reference argument here were excluded from the summary
judgment record through RGM=s objections.  





[36]  The Texas
Supreme Court recently concluded that Apass-through@ claims, as contemplated by this language of the
subcontract, are permissible under Texas law despite a lack of privity between
the subcontractor and the owner.  See
Interstate Contracting Corp. v. City of Dallas, 135 S.W.3d 605, 607 (Tex.
2004).  T&S cites to this
decision as support for its argument that the dispute resolution provision of
the General Conditions was agreed to by RGM. 
In Interstate, the contractor filed suit against the City of
Dallas on behalf of a subcontractor for breach of contract and other causes of
action.  Id. at 608.  The City contested the contractor=s right to bring suit on behalf of the subcontractor,
arguing there was no privity of contract between the City and the
subcontractor.  Id. at 610.  The Texas Supreme Court noted in Interstate
the importance of contractual privity in bringing a cause of action and
confined its rationale to construction contracts, stating that A[r]ather than allowing a party to sue another with
whom it has no privity, pass-through claims recognize the continued liability
of a contractor to its subcontractor . . . . This liability gives the
contractor, who is in privity of a contract with an owner, standing to assert
the claims of its subcontractor.@  Id. at 618.  However, in this case, there are no claims
against the owner, and there is direct contractual privity between RGM and
T&S.  Therefore, we do not find Interstate
controlling here. 





[37]  There are no
allegations in this case that RGM=s claim
was one for an extension of time, and therefore, we limit our discussion to
claims for extra compensation. 





[38]  To the extent
the subcontract=s definition as to which claims must be submitted
conflicts with the broader Aclaims@ definition under the prime contract, the subcontract
language controls.  





[39]  Also, in
paragraph 1.2 of the subcontract, the AContract
Documents@ are defined as the attachments to the subcontract,
Attachments A through G.  These
attachments do not include the General Conditions.  However, the term AContract Documents@
contained in paragraph 4.4 appears to reference the prime contract.  Arguably then, the reference to AContract Documents@ in
paragraph 4.4 is ambiguous. 





[40]  Also,
conditions precedent are not favored in the law, and courts tend to construe
contract provisions as covenants rather than as conditions.   See Criswell v. European Crossroads
Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex. 1990).  It is also for this reason that we hesitate
to conclude that RGM agreed to the condition precedent provision in the General
Conditions by reference to the prime contract.





[41]  We do not
agree with RGM=s conclusion that its pay request submitted after
receipt of the default letter sufficed as a notice to T&S of its
claim.  The pay request did not comply
with the subcontract claim provisions.   






[42]  In its
original answer, T&S generally denied that RGM had performed all conditions
precedent to its right to recovery. 
Although T&S argues this was a sufficient assertion of the condition
precedent, under Rule of Civil Procedure 54, this denial is insufficient to
require that RGM prove it complied with the condition precedent.  See Tex.
R. Civ. P. 54; Greathouse v. Charter Nat=l Bank-Southwest, 851 S.W.2d 173, 177 (Tex. 1992); Wade & Sons, Inc. v. Am.
Standard, Inc., 127 S.W.3d 814, 825B26 (Tex.
App.CSan Antonio 2003, pet. denied).     





[43]  Assuming the
requirement under Rule 54Cthat a party Aprove@ those conditions precedent specifically deniedCis an indication of timeliness under the Rule, proof
would be offered at trial or as summary judgment evidence.  Here, T&S specifically denied the
condition precedent more than one year before submission of the summary
judgment motions.  





[44]  In addition,
there is evidence in the record that RGM did advise T&S it would
communicate with Campbell directly regarding his rejection of the work and
T&S did argue this action by RGM amounted to estoppel.  Whether RGM=s
statement would bar its ability to assert the equitable defense of laches also
remains a fact issue.